Nos. 13-1559, 14-1128

# United States Court of Appeals
# for the Federal Circuit

MORPHO DETECTION, INC.,

*Plaintiff-Cross Appellant,*

*v.*

SMITHS DETECTION INC.,

*Defendant-Appellant.*

*Appeals from the United States District Court for the Eastern District of Virginia in No. 11-CV-0498, Judge Mark S. Davis.*

## BRIEF FOR THE DEFENDANT-APPELLANT
## SMITHS DETECTION INC.

JOHN R. HUTCHINS
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
(202) 220-4200

ZAED M. BILLAH
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

*Counsel for Defendant-Appellant Smiths Detection Inc.*

February 3, 2014



# CERTIFICATE OF INTEREST

Counsel for Smiths Detection Inc. certifies the following:

1.   The full name of every party or amicus represented by me is:

     Smiths Detection Inc.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

     Not applicable.

3.   All parent corporations and publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     Smiths Detection US, LLC owns 100% of Smiths Detection Inc.; Smiths Detection Group Ltd. owns 100% of Smiths Detection US, LLC; Smiths Group International Holdings Ltd. owns 100% of Smiths Detection Group Ltd.; Smiths Group plc owns 100% of Smiths Group International Holdings Ltd.

4.   The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

     **Kenyon & Kenyon LLP:** John R. Hutchins, Edward T. Colbert, Huiya Wu, Zaed M. Billah, Eric T. Schreiber

     **Willcox & Savage, P.C.:** Conrad M. Shumadine, Stephen R. Jackson, Gary A. Bryant, Jason E. Ohana

     **Other Counsel:** Bradley D. Roush, Michael R. Katchmark

Dated:  February 3, 2014                    */s/ Zaed M. Billah*
                                            Zaed M. Billah

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ...................................................................vi

STATEMENT OF RELATED CASES ................................................. xii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE SETTING OUT FACTS RELEVANT
TO THE ISSUES ......................................................................................3

    A.    The '670 Patent and its Prosecution History ........................5

    B.    Evidence of Invalidity ...........................................................7

            1.    Seibert ........................................................................7

            2.    Davies.........................................................................9

    C.    Evidence of Noninfringement .............................................10

    D.    The District Court's Exclusion of Smiths' Expert Testimony............11

SUMMARY OF THE ARGUMENT ......................................................13

ARGUMENT .........................................................................................15

I.    STANDARD OF REVIEW.............................................................15

II.    THE ASSERTED CLAIMS OF THE '670 PATENT ARE OBVIOUS
AS A MATTER OF LAW...............................................................16

    A.    The Scope and Content of the Prior Art.............................17

1.     Legal Principles of Analogous Art ...........................................17

2.     The "Problem" Addressed by the '670 Patent is the Need to Replace a Dryer Once it Becomes Saturated ........................19

3.     Seibert Has the Same Purpose as the Claimed Invention and Relates to the Same Problem ............................................20

4.     The Jury's Erroneous Finding that Seibert was not Analogous Prior Art Fundamentally Undermines the Jury's Verdict of Nonobviousness ............................................22

5.     The District Court's Grounds for Sustaining the Jury's Finding on Analogous Art Were Erroneous ...........................23

      a.     The District Court Erred by Relying on Dr. Denton's Demeanor and Responsiveness .....................................23

      b.     The District Court Erred By Relying on Dr. Denton's Status as a "Super-Expert" ...........................................24

      c.     Dr. Denton Did Not Rely on Improper "Hindsight" in his Analysis..............................................................26

      d.     The District Court Erred By Relying on the Testimony of Fact Witnesses Mr. Jenkins and Dr. Nacson.............27

      e.     The District Court Erred by Relying on Purported Failures of Smiths .........................................................29

B.     The Differences Between the Prior Art and the Claimed Invention...30

C.     The Level of Ordinary Skill in the Art................................................32

D.     Motivation to Combine ......................................................................32

E.     Secondary Considerations of Nonobviousness ..................................36

1.     Morpho Failed to Prove that its Itemiser 3 Product is Covered by the Asserted Claims................................................36

2.      Because the Connection of a Dual-Bed Regenerative Drying
        System To a Detector Was Already Known in the Prior Art,
        There Cannot be any Nexus Between any Purported
        Secondary Consideration and the Asserted Claims .................42

3.      The Jury's Finding of Commercial Success is not Supported
        by Substantial Evidence ..............................................................44

4.      The Jury's Finding of Copying is not Supported by
        Substantial Evidence ..................................................................45

5.      The Jury's Finding of Industry Praise is not Supported by
        Substantial Evidence ..................................................................46

6.      The Jury's Findings of Long-Felt Need and Failure of
        Others are not Supported by Substantial Evidence..................47

7.      Any Secondary Considerations Cannot Overcome the Prima
        Facie Case of Obviousness .......................................................49

III.    THE DISTRICT COURT ERRED BY EXCLUDING THE TESTIMONY
        OF DR. HARRINGTON REGARDING NONINFRINGEMENT AND
        DR. RUTHVEN REGARDING INVALIDITY ...........................................50

A.      The District Court Applied an Erroneous View of the Law Which
        is a *Per Se* Abuse of Discretion...........................................................50

B.      Dr. Harrington and Dr. Ruthven were Qualified to Testify as to
        Noninfringement and Obviousness .......................................................53

C.      The Exclusion of the Testimony of Dr. Harrington and Dr. Ruthven
        was Reversible Error and Warrants a New Trial ................................55

IV.     CLAIMS 20, 21, AND 23 OF THE '670 PATENT ARE NOT
        INFRINGED AS A MATTER OF LAW ...................................................56

A.      Because Morpho Failed to Establish that the IonScan 500DT
        Allows for Continuous Operation of the *Detector*, No Reasonable
        Jury Could Find Infringement of Claims 20, 21, and 23 ...................56

B.    Because Morpho Failed to Prove that Each Step of the Method Claims has been Performed in the United States in the Damages Period, No Reasonable Jury Could Find Infringement of Claims 20, 21, and 23 ...........................................................................59

C.    No Reasonable Jury Could Find that Smiths had the Necessary Intent for Induced or Contributory Infringement ...............................59

V.    CONCLUSION...............................................................................................61

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Agrizap, Inc. v. Woodstream, Corp.*,
  520 F.3d 1337 (Fed. Cir. 2008) ........................................................49

*Alcon Research, Ltd. v. Apotex Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012) ........................................................36

*Al-Site Corp. v. VSI Intern., Inc.*,
  174 F.3d 1308 (Fed. Cir. 1999) ................................................. 24, 52

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) ..................................... 27, 37, 41, 42

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
  776 F.2d 281 (Fed. Cir. 1985) ...................................... 37, 41, 42

*Asyst Techs., Inc. v. Emtrack, Inc.*,
  544 F.3d 1310 (Fed. Cir. 2008) .............................................. passim

*Bayer Healthcare Pharms., Inc. v. Watson Pharms.*,
  713 F.3d 1369 (Fed. Cir. 2013) ........................................................35

*Biodex Corp. v. Loredan Biomedical, Inc.*,
  946 F.2d 850 (Fed. Cir. 1991) ........................................................23

*Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.*,
  249 F.3d 1341 (Fed. Cir. 2001) ......................................................24

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ............................................................ 38, 39, 58

*Cable Electric Prods., Inc. v. Genmark, Inc.*,
  770 F.2d 1015 (Fed. Cir. 1985) .......................................................45

*Chesapeake & Ohio Ry. Co. v. Martin*,
  283 U.S. 209 (1931) ............................................................... 21, 24

*Commil USA, LLC v. Cisco Sys.*,
   720 F.3d 1361 (Fed. Cir. 2013) ................................................. 15, 60

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990) ........................................................................ 53

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012) ..................................................... 39

*Dixon v. Edwards*,
   290 F.3d 699 (4th Cir. 2002) ........................................................ 52

*Duramed Pharms., Inc. v. Watson Labs., Inc.*,
   413 Fed. Appx. 289 (Fed. Cir. 2011) ........................................... 25

*DyStar Textilfarben GmbH& Co. Deutschland KG v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006) ..................................................... 33

*Eli Lilly and Co. v. Teva Pharmas. USA, Inc.*,
   557 F.3d 1346 (Fed. Cir. 2009) ..................................................... 52

*Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*,
   122 F.3d 1040 (Fed. Cir. 1997) ..................................................... 25

*Evans Cooling Sys., Inc. v. General Motors Corp.*,
   125 F.3d 1448 (Fed. Cir. 1997) ..................................................... 31

*EWP Corp. v. Reliance Universal Inc.*,
   755 F.2d 898 (Fed. Cir. 1985) ....................................................... 32

*Geo M. Martin Co. v. Alliance Machines Sys.*,
   618 F.3d 1294 (Fed. Cir. 2010) ........................................... 46, 47, 48

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011) ................................................................... 59

*Habecker v. Copperloy Corp.*,
   893 F.2d 49 (3d Cir. 1990) ............................................................ 55

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) ..................................................... 28

*In re Baxter Travenol Labs.*,
   952 F.2d 388 (Fed. Cir. 1991) ...........................................................44

*In re Carlson*,
   983 F.2d 1032 (Fed. Cir. 1992) ................................................... 29, 30

*In re Clay*,
   966 F.2d 656 (Fed. Cir. 1992) ..................................................... 17, 18

*In re GPAC Inc.*,
   57 F.3d 1573 (Fed. Cir. 1995) ..................................................... 18, 26

*In re Huang*,
   100 F.3d 135 (Fed. Cir. 1996) ...........................................................44

*In re ICON Health & Fitness, Inc.*,
   496 F.3d 1374 (Fed. Cir. 2007) ................................................... 18, 26

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ...........................................................27

*In re Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) ........................................... 42, 43, 44

*In re Oetiker*,
   977 F.2d 1443 (Fed. Cir. 1992) .........................................................26

*In re Thrift*,
   298 F.3d 1357 (Fed. Cir. 2002) .........................................................33

*Innovention Toys, LLC v. MGA Entm't, Inc.*,
   637 F.3d 1314 (Fed. Cir. 2011) .................................... 17, 18, 20, 32

*Johns Hopkins Univ. v. Datascope Corp.*,
   543 F.3d 1342 (Fed. Cir. 2008) ........................................... 38, 39, 58

*Kansas Jack, Inc. v. Kuhn*,
   719 F.2d 1144 (Fed. Cir. 1983) .........................................................45

*Konkel v. Bob Evans Farms Inc.*,
   165 F.3d 275 (4th Cir. 1999) ............................................................15

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)................................................................ 13, 17, 35, 49, 50

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
    628 F.3d 1359 (Fed. Cir. 2010) ...............................................................56

*Leapfrog Enters. v. Fisher-Price, Inc.*,
    485 F.3d 1157 (Fed. Cir. 2007) ...............................................................49

*Lockheed Aircraft Corp. v. U.S.*,
    553 F.2d 69 (Ct. Cl. 1977)........................................................................30

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
    690 F.3d 1354 (Fed. Cir. 2012) ....................................................... 55, 59

*Mintz v. Dietz & Watson, Inc.*,
    679 F.3d 1372 (Fed. Cir. 2012) ...............................................................36

*Muniauction, Inc. v. Thompson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) ........................................................ 37, 41, 42

*Mytee Products, Inc. v. Harris Research, Inc.*,
    439 Fed. Appx. 882 (Fed. Cir. 2011)........................................................51

*Newell Cos. Inc. v. Kenney Mfg. Co.*,
    864 F.2d 757 (Fed. Cir. 1998) ...............................................................48

*Norgren Inc. v. Int'l Trade Comm'n*,
    699 F.3d 1317 (Fed. Cir. 2012) ....................................................... 27, 35

*Odom v. Microsoft Corp.*,
    429 Fed. Appx. 967 (Fed. Cir. 2011)........................................................49

*Plantronics, Inc. v. Aliph, Inc.*,
    724 F.3d 1343 (Fed. Cir. 2013) ...............................................................33

*Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*,
    411 F.3d 1332 (Fed. Cir. 2005) ....................................................... 21, 24

*Quanta-Ruiz v. Hyundai Motor Corp.*,
    303 F.3d 62 (1st Cir. 2002)....................................................... 22, 24

*Rambus Inc. v. Rea*,
  731 F.3d 1248 (Fed. Cir. 2013) ............................................................ 42, 43, 44

*Randall Mfg. v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013) ............................................................ 33

*Rohm and Haas Co. v. Brotech Corp.*,
  127 F.3d 1089 (Fed. Cir. 1997) ............................................................ 38, 39, 58

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
  594 F.3d 1360 (Fed. Cir. 2010) ............................................................ 51, 53, 54

*Smith & Nephew, Inc. v. Rea*,
  721 F.3d 1371 (Fed. Cir. 2013) ............................................................ 27, 32, 49

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011) ............................................................ 15, 56

*Std. Oil Co. v. Am. Cyanamid Co.*,
  774 F.2d 448 (Fed. Cir. 1985) ............................................................ 27

*Stone Strong, LLC v. Del Zotto Prods. of Fla., Inc.*,
  455 Fed. Appx. 964 (Fed. Cir. 2011) ............................................................ 49

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
  550 F.3d 1356 (Fed. Cir. 2009) ............................................................ 50, 51

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  593 F.3d 1325 (Fed. Cir. 2010) ............................................................ 48

*TorPharm v. Ranbaxy Pharms., Inc.*,
  336 F.3d 1322 (Fed. Cir. 2003) ............................................................ 27, 32, 49

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
  699 F.3d 1340 (Fed. Cir. 2012) ............................................................ 49

*United Transp. Union v. South Carolina Public Railway Commission*,
  130 F.3d 627 (4th Cir. 1997) ............................................................ 52

*Upjohn Co. v. MOVA Pharm. Corp.*,
  225 F.3d 1306 (Fed. Cir. 2000) ............................................................ 38, 39

*Vanmoor v. Wal-Mart Stores, Inc.*,
    201 F.3d 1363 (Fed. Cir. 2000) .........................................................31

*Wechsler v. Macke Int'l Trade, Inc.*,
    486 F.3d 1286 (Fed. Cir. 2007) .........................................................38

*Western Union Co. v. Moneygram Payment Sys.*,
    626 F.3d 1361 (Fed. Cir. 2010) .........................................................49

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed. Cir. 2010) ........................................... 17, 18, 28, 36, 46, 49

## STATUTES

35 U.S.C. § 271(b) ........................................................................59

35 U.S.C. § 271(c) ..................................................................... 59, 60

35 U.S.C. § 287(a) ........................................................................59

## OTHER AUTHORITIES

MPEP § 2141.01(a)...................................................................... 18, 26

## STATEMENT OF RELATED CASES

Federal Circuit Appeal Nos. 13-1559 and 14-1128 have been consolidated. There has been no other appeal in or from the same civil action in this Court or any other appellate court. Counsel is not aware of any case pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1338(a).  Final judgment was entered on December 19, 2012.  Smiths timely filed motions for JMOL and a new trial on January 8, 2013.  The district court denied Smiths' motions on July 11, 2013.  Smiths timely filed a notice of appeal on August 8, 2013.  Accordingly, this Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

I.      Did the district court err in denying Smiths' motion for JMOL of obviousness when the text of the prior art references themselves establish obviousness and Morpho offered no rebuttal expert testimony on nonobviousness?

II.     Did the district court err in denying Smiths' motion for a new trial when the district court applied an incorrect standard in excluding the testimony of Smiths' experts on noninfringement and invalidity, i.e., excluding the testimony because the experts did not qualify as a hypothetical person of ordinary skill in the art?

III.    Did the district court err in denying Smiths' motion for JMOL of noninfringement of claims 20, 21, and 23 when the manner of operation of the accused product is not disputed and does not meet all the claim elements?

## STATEMENT OF THE CASE SETTING OUT THE
## FACTS RELEVANT TO THE ISSUES

On September 2, 2011, Morpho sued Smiths in the District Court for the Eastern District of Virginia, alleging that a particular detection system used *e.g.* at airports to detect contraband, infringed U.S. Patent No. 6,815,670 ("the '670 patent"). A1355-A1374. The district court issued a claim construction order on October 19, 2012. A91-A144. The matter was tried in December 2012.

The infringement case was notable in that only Morpho presented expert testimony; the Court excluded Smiths' expert testimony of noninfringement because the expert did not meet the qualifications of the hypothetical ordinary-skilled artisan. The expert's opinions, however, were pertinent and well within his area of expertise. In any event, Morpho's expert conceded that the accused product was not to be operated continuously, so that it could be cleaned daily in a multi-hour process called "baking out." Notwithstanding this testimony, the product was held to infringe method claims requiring continuous operation. A2-A10.

The validity case was also notable in that only Smiths presented expert testimony regarding obviousness. The alleged invention of the '670 patent was the use of a basic dual-dryer system for providing a continuous stream of dry air to a detector. Smiths presented prior art that not only disclosed this dual-dryer system, but also explicitly recommended its use as a source of continuous dry air for lab

instruments. In response, Morpho chose to defend its patent using only evidence of secondary considerations of nonobviousness, such as copying and industry praise for its own detector systems, which were not proven to be embodiments of the asserted claims. Despite the uncontradicted testimony of Smiths' expert and the teaching of the prior art itself, the jury issued an advisory opinion that the prior art was not analogous, and that the patent was not obvious. A2-A10.

On December 19, 2012, the district court found the '670 patent not invalid and issued final judgment. A11-A13; A1. On January 8, 2013 Smiths filed a renewed motion for JMOL and a motion for a new trial. A11190-A11192; A11225-A11227. On July 11, 2013, the district court denied Smiths' motions. A14-A67.

The district court rulings presented for review are (1) the district court's denial of Smiths' renewed motion for JMOL of obviousness (A14-A67), (2) the district court's exclusion of testimony from Smiths' experts (A68-A74) and subsequent denial of Smiths' motion for a new trial based on the erroneous exclusion (A14-A67), and (3) the district court's denial of Smiths' motion for JMOL of noninfringement of claims 20, 21, and 23 (A14-A67). The facts relevant to the issues are described below.

## A. The '670 Patent and its Prosecution History

The '670 patent issued on November 9, 2004 and has a priority date of October 6, 1998. A1293-A1303. Well before 1998, it was known that certain detectors (including ion mobility spectrometers ("IMS")) required a stream of dry air to operate, for instance, to carry samples into the detector. The Asserted Claims[1] of the '670 patent are directed to the use of a rudimentary two-dryer drying system to provide this dry air to a detector. As described in more detail below, the system allows air to flow through a first dryer while the other dryer is recharged (dried out). When the first dryer becomes too wet, the air flow is directed through the second dryer while the first dryer is then recharged. The alleged inventiveness of the claims resides not in the detector technology, but rather the drying system attached to the detector. Claim 20 of the '670 patent is exemplary and is reproduced below.

> **20**. A method for continuously operating a detector for detecting particles of interest, said method comprising:
>    operating one of first and second dryers for defining an operated dryer and a non-operated dryer;
>    directing a stream of air through the operated dryer for transferring moisture from the stream of air to the operated dryer to produce a stream of dry air;
>    directing the stream of dry air from the operated dryer toward an object to be tested for particles of interest and then toward the detector;

---

[1]    "Asserted Claims" refers to claims 12, 13, 14, 17, 20, 21, and 23 of the '670 patent.

> recharging the non-operated dryer; and
>
> switching the stream of air from one of the dryers to the other after the non-operated dryer has been at least partially recharged and before the operated dryer has become saturated.

The vast majority of the '670 patent specification does not concern the two-dryer configuration that is central to each of the Asserted Claims. Instead, the claimed two-dryer configuration is described only briefly and at a high level in a single paragraph of the specification (A1302(5:66-6:16)), and shown in only one figure (A1299(Fig. 9)). The sole embodiment of the two-dryer configuration disclosed by the '670 patent uses a valve in communication with the two dryers to alternate which one of the dryers is drying and which one is being regenerated:



A1299(Fig. 9). While Dryer A dries the air flowing to the detector, Dryer B is recharged by Heater B. A portion of the dry air output from Dryer A is directed in a reverse direction through Dryer B to purge water from Dryer B. After the valve is switched to its other position, Dryer B now dries the air flowing to the detector and Dryer A is recharged by Heater A. A portion of the dry air output from Dryer

B is directed in the reverse direction through Dryer A to purge water from Dryer

A. A1302(5:66-6:16).

During prosecution, the examiner was not provided any prior art references

disclosing two regenerative dryers, and thus was unaware that these basic two-

dryer systems were a well-known way to produce a continuous stream of dry air

for lab instruments such as detectors. Indeed, as seen immediately below, the prior

art ironically provides a much more detailed description of the allegedly inventive

drying system than does the '670 patent.

### B.     Evidence of Invalidity

#### 1.     Seibert

U.S. Patent No. 3,513,631 ("Seibert") issued on May 26, 1970, and is prior

art to the '670 patent. A11973-A11981. Seibert discloses a dual-bed regenerative

drying system for producing a "substantially continuous flow of effluent gas" that

"can be used for drying gases of *all types*, such as for drying *small flows* of

compressed gases in *instrument* air." A11975-A11980(1:34, 12:3-4, 12:45-46,

10:15-17); *see also* A848-A849(704:16-705:17).[2] Seibert also explains that these

dual-bed regenerative drying systems were well known, even back in 1970.

A11975(1:56-2:21). The regenerative drying system of Seibert is shown here:

---

[2]     Unless otherwise indicated, all emphasis to quotations from the record
herein has been added.



FIG. I

A11973(Fig.1)(red annotations added); A11976-A11977(4:71-6:20). The dual-bed regenerative drying system disclosed in Seibert, just like the claimed drying system, operates by passing air through one dryer while the other is recharged, and then alternating the dryers when the first dryer becomes wet and the second dryer has been dried out. A11973; A11975-A11977(Fig. 1, 1:15-40, 1:49-2:4, 2:22-29, 4:15-19, 4:46-47, 4:56-62, 4:71-6:20); *see also* A842-A844(698:22-700:3). Indeed, the general description of the Seibert dryer (A11973(1:56-2:4)) could readily be interchanged with the sole description of the dryer in Morpho's patent ((A1302(5:66-6:16)).

Moreover, Seibert is not the only reference disclosing a dual-bed regenerative drying system. Numerous other prior art references describe dual-bed regenerative drying systems, including those connected to detectors. A11982-A11993; A11994-A11998; A12012-A12024; A12749-A12764; A12765-A12775; A12776-A12794; A12795-A12799; A841-A842(697:5-698:5).

### 2. Davies

U.S. Patent No. 5,405,781 ("Davies") issued on April 11, 1995, and is prior art to the '670 patent. A11999-A12011. Davies discloses a two-dryer drying system for providing a stream of dry air to an IMS detector. The IMS detector also makes use of a swab or trap where a heater ("desorber") heats the trap to vaporize particles of interest on the trap. The stream of dry air passes through the desorber and the trap and carries the desorbed vapors into the IMS detector where they can be detected. A12000-A12001 (Fig. 1, Fig. 2); A12006-A12008 (1:6-9, 2:14-19, 2:38-3:2, 4:27-5:20, 5:50-6:2, 6:37-56); *see also* A854(710:20-25). The system is shown below:



A12001(Fig. 2 (red annotations added)).

At trial, Smiths' expert provided uncontradicted testimony that the combination of the Seibert dryer with the Davies detector rendered the '670 patent's claims obvious.  A853(709:13-23)  He testified that Seibert specifically taught that its dryer could be used with lab instruments, and that the substitution of one dryer for another was a trivial exercise.  A848-A849(704:16-705:17); A876-A877(732:21-733:10).

## C.    Evidence of Noninfringement

The only accused product is Smiths' IonScan 500DT.  The IonScan 500DT is a contraband detection system employing two IMS detectors.  A13300-A13511.

Although the IonScan 500DT employs a dual-bed regenerative drying system, it does not meet the asserted method claims because the product is not capable of "continuously operating." Customers of the IonScan 500DT are instructed to perform a cleaning cycle called a "bake-out" daily, which causes the system to be shut down for at least three and half hours each day (or more than 14 percent of the day). A13442; A527-A528(383:14-384:9); A733-A735(589:7-591:16). Additionally, during use the IonScan 500DT operates on a discrete or "batch process," meaning it is only designed to detect discrete samples contained on a sample wipe, one sample at a time. A528-A529(384:18-385:4); A731-A733(587:19-589:6); A12259; A12274. This non-continuous, batch sampling is in contrast to detectors that continuously sample air, just as those used to monitor ventilation systems of buildings. A687(543:6-25); A690-A691(546:14-547:11). Because of this batch process, the IonScan 500DT is only capable of detecting samples for a maximum of 40 percent of the time. A13325.[3] In contrast, claims 20, 21, and 23 require continuous operation of the detector, which simply does not occur with the accused product.

### D. The District Court's Exclusion of Smiths' Expert Testimony

Four days before trial, the district court excluded the testimony of Smiths' experts Dr. Peter Harrington regarding noninfringement and Dr. Douglas Ruthven

---

[3] The 500DT can analyze 180 samples per hour with eight second analyses: (180 samples per hour)*(8 seconds)÷(3600 seconds) = 40%. A13325.

regarding invalidity.  A68-A74.  The district court ruled that these witnesses could

not testify to infringement or obviousness because they did not strictly meet the

definition of a person of ordinary skill in the art.  A68-A74.

## SUMMARY OF THE ARGUMENT

This is a textbook case of obviousness.  Each Asserted Claim of the '670 patent is nothing more than the mere substitution of one prior art drying system for another prior art drying system, and that substitution yields no more than predictable results.  Under the principles articulated by the Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), the Asserted Claims are obvious as a matter of law.  At trial, Morpho did not dispute that a combination of the Seibert and Davies prior art references discloses all the elements of each Asserted Claim.  Indeed, obviousness is so apparent from the plain language of the prior art that Morpho did not offer any expert testimony on nonobviousness at all.  Instead, Morpho introduced evidence of purported secondary considerations of nonobviousness largely centered around its Itemiser 3 product.  However, the Itemiser 3 is not even covered by the Asserted Claims, rendering it irrelevant to the obviousness inquiry.  Moreover, even if there were a nexus between any alleged secondary consideration and the claims, the prior art itself overwhelmingly demonstrates the obviousness of the claims, rendering them invalid as a matter of law.

The district court also committed reversible error in excluding the testimony of Smiths' experts on noninfringement and invalidity.  The district court erroneously believed that a noninfringement or invalidity expert must qualify as a

-13-

hypothetical person of ordinary skill in the art to offer any testimony bearing on infringement or invalidity.  Because the district court applied an incorrect legal standard in excluding Smiths' expert testimony, this error was a *per se* abuse of discretion.  Without the testimony of two of its experts, Smiths was prejudiced in its ability to present its defenses at trial.  Accordingly, in the alternative to an outright reversal on the merits, Smiths is entitled to a new trial on infringement and invalidity.

Further, certain Asserted Claims are also not infringed as a matter of law. The accused IonScan 500DT is not capable of "continuously operating" as required by claim 20.  At trial, Morpho's expert's conclusion that this claim element was met is simply inconsistent with the undisputed manner in which the accused product operates.  Upon examination of the relevant structure and operation of the accused product, no reasonable jury could have found infringement of claim 20 or its associated dependent claims.

# ARGUMENT

## I.    STANDARD OF REVIEW

On appeal, a motion for JMOL is reviewed "without deference in the light most favorable to the nonmoving party." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1372 (Fed. Cir. 2011) (applying Fourth Circuit law). JMOL must be granted where a court finds that "substantial evidence does not support the jury's findings." *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 279 (4th Cir. 1999).

The Federal Circuit "reviews a district court's decision to exclude evidence under the law of the regional circuit." *Star Scientific*, 665 F.3d at 1372. "The Fourth Circuit reviews a district court's decision to admit or exclude evidence for an abuse of discretion." *Id*. "Even if an evidentiary ruling constitutes an abuse of discretion, it is only reversible when it affects a party's substantive rights." *Id*.

The Federal Circuit also "review[s] the denial of a motion for a new trial under the law of the regional circuit." *Commil USA, LLC v. Cisco Sys.*, 720 F.3d 1361, 1365 (Fed. Cir. 2013). In the Fourth Circuit, "[a] denial of a motion for a new trial is reviewed for an abuse of discretion." *Star Scientific*, 665 F.3d at 1372. "A new trial is granted in the Fourth Circuit only when there is conduct so grievous as to have rendered the trial unfair." *Id.* at 1373 (internal citation omitted).

## II. THE ASSERTED CLAIMS OF THE '670 PATENT ARE OBVIOUS AS A MATTER OF LAW

The prior art drying system of Seibert can be interchanged with the prior art drying system of Davies, as indicated here:



A12001(Fig. 2); A11973(Fig. 1). As described below, the *Graham* factors establish that this prior art combination renders the Asserted Claims obvious as a matter of law.

A.     **The Scope and Content of the Prior Art**

1.     **Legal Principles of Analogous Art**

The Supreme Court's decision in *KSR* "directs us to construe the scope of analogous art broadly, stating that '*familiar items may have obvious uses beyond their primary purposes*, and a person of ordinary skill often will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010) (emphasis in original) (citing *KSR*, 550 U.S. at 402). "Two separate tests define the scope of analogous art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1321 (Fed. Cir. 2011) (internal citation omitted). "A reference is reasonably pertinent if . . . it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *Id.* (citing *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992)). "If a reference disclosure has the same purpose as the claimed invention, the reference relates to the same problem, and that fact supports use of that reference in an obviousness rejection." *Id.* Although it is a fact question, in many cases this Court has found a prior art reference to be analogous as a matter of law.

*See, e.g.*, *Wyers*, 616 F.3d at 1238; *Innovention Toys*, 637 F.3d at 1322-23; *Asyst Techs., Inc. v. Emtrack, Inc.*, 544 F.3d 1310, 1313 (Fed. Cir. 2008).

In applying the test for whether a reference is "reasonably pertinent" to the inventor's problem, a district court must first correctly identify that problem. A fundamental point overlooked by the district court here is that this "problem" must be addressed by the "claimed invention," otherwise it is not the "problem" underlying the issue of analogous art. *In re GPAC Inc.*, 57 F.3d 1573, 1578 (Fed. Cir. 1995) ("If a reference disclosure relates to the same problem as that addressed by the *claimed invention*, 'that fact supports use of that reference in an obviousness rejection.'") (citing *In re Clay*, 966 F.2d at 659). In identifying the "problem" addressed by the claimed invention, this Court has referred to the claim limitations themselves and the specification. *See, e.g.*, *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1380 (Fed. Cir. 2007). Also consistent with this approach is the MPEP's guidance that "[i]n determining whether a reference is reasonably pertinent, an examiner should consider the problem faced by the inventor, as reflected—either explicitly or implicitly—in the specification." MPEP § 2141.01(a). Thus, the "problem" addressed by the claimed inventions should be ascertained with reference to the claims themselves and the specification.

## 2.    The "Problem" Addressed by the '670 Patent is the Need to Replace a Dryer Once it Becomes Saturated.

Applying the guidelines set forth above, the '670 patent establishes that the "purpose" of the '670 patent is to allow "continuous operation." The "problem" with achieving continuous operation is the need to replace a dryer when it becomes saturated. A1293(abstract); A1302-A1303(claims 9, 20, 24, 25; 5:66-6:16). The "solution" to the saturation problem is a dual-bed regenerative drying system that alternates dryers so that one may be recharged before the other becomes saturated.[4] The parties agreed on this at trial. A246-A247(102:15-18, 103:19-22); A252(108:14-16); A474-A475(330:21-331:15); A539(395:8-16). For example, *Morpho* offered the following expert testimony:

> **Q.**    Dr. Bell, what does the patent say the purpose of the regenerative dryer is of the '670 patent?
>
> **A.**    To allow continuous operation.
>
> **Q.**    And what problem does the regenerative drying system solve in that patent?
>
> **A.**    It specifically solves the problem that I discussed earlier about having to replace that dryer, having to shut down, having to pay consumables. So it replaces a disposable

---

[4]    The '670 patent suggests that "continuous operation" of the detector is "permitted" by a dual-bed regenerative drying system. A1293(abstract). However, the presence of a dual-bed regenerative drying system does not *per se* "permit" continuous operation of the detector because there could be other impediments to continuous operation. As described below, the IonScan 500DT does not meet the limitation of "continuously operating a detector" in claim 20 even though the device contains a dual-bed regenerative drying system.

consumable part with something that I never have to deal
with again.

A539(395:8-16).

### 3. Seibert Has the Same Purpose as the Claimed Invention and Relates to the Same Problem.

Because Seibert has the "same purpose" as the claimed invention, the
reference relates to the "same problem," and is thus analogous prior art as a matter
of law. *Innovention Toys*, 637 F.3d at 1321 ("If a reference disclosure has the
same purpose as the claimed invention, the reference relates to the same problem,
and that fact supports use of that reference in an obviousness rejection.") (internal
citation omitted). Here, the purpose of the claimed invention is to allow
continuous operation, and the problem solved by the claimed regenerative drying
system is the need to "shut down" and "replace th[e] dryer." A539(395:8-16).
Seibert repeatedly states that its drying system provides a "substantially *continuous*
flow of effluent gas." A11975(1:34); A11980(12:3-4, 12:45-46). Moreover,
Seibert explicitly states that "[t]he dryers in accordance with the invention can be
used for *drying gases of all types*, such as for drying small flows of compressed
gasses in *instrument* air. . . ." A11979(10:15-17). In light of the explicit disclosure
in Seibert and the problem discussed in the '670 patent, Seibert is analogous prior
art to the '670 patent as a matter of law. *Innovention Toys*, 637 F.3d at 1321.

Furthermore, Smiths' invalidity expert Dr. Bonner Denton gave *unrebutted*
testimony that Seibert is analogous prior art because it describes regenerative
dryers supplying a continuous flow of dry air for laboratory instruments, and IMS
detectors are laboratory instruments. A11975(1:34); A11979-A11980(10:15-17,
11:53, 12:3-4, 12:18, 12:45-46); A848-A849(704:16-705:17); A876-A877(732:21-
733:3).[5] Because Dr. Denton's testimony on this issue went unchallenged by an
opposing expert, the jury's contrary finding should be rejected for lack of
substantial evidentiary support. *See Princeton Biochemicals, Inc. v. Beckman
Coulter, Inc.*, 411 F.3d 1332, 1338-40 (Fed. Cir. 2005) (affirming grant of JMOL
overturning jury verdict of nonobviousness where plaintiff offered no evidence to
rebut defendant's invalidity expert); *Chesapeake & Ohio Ry. Co. v. Martin*, 283
U.S. 209, 216 (1931) ("[T]he question of credibility of witnesses is one for the jury
alone; but this does not mean that the jury is at liberty, under the guise of passing
upon the credibility of a witness, to disregard his testimony, when from no
reasonable point of view is it open to doubt."). Indeed, another court of appeals
has held that "[t]he general rule that a jury verdict cannot be based solely on the
jury's rejection of the other side's uncontradicted testimony applies with particular

---

[5]    During JMOL proceedings, Morpho made much of the fact that Seibert is
titled a "gas fractionator" patent. This is of no consequence because Dr. Denton
testified that the process of removing water from air *is* "gas fractionation." A851-
A852(707:7-708:6); A12006(1:49-55, 2:22-29); A12010-A12011(claim 2, 11:15-
17).

-21-

force to expert testimony on matters outside of lay competence. While juries may

decide what weight to give to the testimony of expert witnesses, they are not at

liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached

testimony of an expert witness where the testimony bears on technical questions

beyond the competence of lay determination." *Quanta-Ruiz v. Hyundai Motor*

*Corp.*, 303 F.3d 62, 76-77 (1st Cir. 2002).

> **4.     The Jury's Erroneous Finding that Seibert was not
> Analogous Prior Art Fundamentally Undermines the Jury's
> Verdict of Nonobviousness.**

When the jury errs on the threshold question of analogous art in a special

verdict form, that error "fundamentally undermine[s]" the jury's verdict of

nonobviousness. *Asyst Techs.*, 544 F.3d at 1313. The jury's verdict in this case is

identical to that in *Asyst* insofar as the entire series of questions related to

obviousness, including those on analogous art, motivation to combine, and

secondary considerations were answered in favor of nonobviousness. *Compare*

A14629-A14634 to A2-A10. As described herein, the jury's finding that Seibert is

not analogous prior art is not supported by substantial evidence. As a result, this

erroneous finding had a domino effect on all the other questions regarding

obviousness. *See Asyst Techs.*, 544 F.3d at 1313. All of the jury's findings related

to obviousness should be rejected based on the analogous art issue alone. *Id*.

Accordingly, in the alternative to the Court holding that the Asserted Claims are

obvious as a matter of law, Smiths requests that *at a minimum* this Court remand
for a new trial on obviousness with the jury instructed that Seibert is analogous
prior art. *Id.*

### 5. The District Court's Grounds for Sustaining the Jury's Finding on Analogous Art Were Erroneous.

The district court provided several grounds for why it found substantial
evidence supporting the jury's finding that Seibert was not analogous art. Each of
these grounds should be rejected for the reasons described below.

#### a. The District Court Erred by Relying on Dr. Denton's Demeanor and Responsiveness.

The district court described Dr. Denton as "excitable," "fervid," and that he
"had a tendency to veer off course and provide long-winded testimony about
matters other than the question directed to him, which similar to his demeanor,
could have impacted <u>the weight</u> the jury gave to his testimony." A23-
A24(emphasis in original).[6] The district court's proposition that such observations
can sustain a jury verdict under *Biodex Corp. v. Loredan Biomedical, Inc.*, 946
F.2d 850 (Fed. Cir. 1991) is incorrect. This Court has never relied on "demeanor"

---

[6] It should be noted that the district court's characterization of Dr. Denton's
testimony is demonstrably overstated. The alleged "long-winded testimony" and
"veer[ing] off course" is not even referring to the testimony on the issue of
analogous art. The testimony of Dr. Denton on this issue was less than two pages
in the trial transcript. A848-A849(704:16-705:17); A876-A877(732:21-733:3).
Furthermore, it is unclear why a "fervid" expert should be given less weight by the
jury than a timid one.

or "responsiveness" as grounds for rejecting testimony unless there was a need for the jury to weigh *conflicting* evidence. *Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.*, 249 F.3d 1341, 1351 (Fed. Cir. 2001) ("*To the extent there was conflicting evidence*, the jury's evaluation of the evidence could include determinations of the reliability of the data and the credibility of the witnesses.") (citing *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1317 (Fed. Cir. 1999)). Here, Morpho offered no expert opinion that Seibert was not analogous prior art. The district court even agreed that Dr. Denton's testimony was "*largely unrebutted*." A24. Indeed, the district court even went so far as to say "if the Court was the finder of fact, the Court would have concluded that [Seibert] is analogous to Morpho's '670 patent as it appears to be 'reasonably pertinent' to the problem solved by Morpho's patent." A23(n.6); *see also* A39. Thus, by definition the district court agreed that the record contains clear and convincing evidence that Seibert is analogous prior art. Because there is no relevant countervailing evidence, the jury's finding must be rejected as a matter of law. *See Princeton Biochemicals*, 411 F.3d at 1338-40; *Chesapeake*, 283 U.S. at 216; *Quanta-Ruiz*, 303 F.3d at 76-77.

### b. The District Court Erred By Criticizing Dr. Denton's Status as a "Super-Expert."

The district court characterized Dr. Denton as a "super-expert" and thus concluded that his testimony could be given less weight because Dr. Denton's level

of skill was far beyond that of the hypothetical person of "ordinary" skill. A26-A28. However, the fact that an expert is of extraordinary skill does not preclude his ability to testify as to the knowledge of one of ordinary skill in the art. *Duramed Pharms., Inc. v. Watson Labs., Inc.*, 413 Fed. Appx. 289, 296 (Fed. Cir. 2011) ("[T]he district court appears to have simply rejected all of Watson's expert's testimony by finding that Thomas was not a person of ordinary skill, but extraordinary skill. That was error. Since a determination of obviousness is made from the vantage point of a legal construct, a hypothetical person having ordinary skill in the pertinent art, a person of extraordinary skill may opine on the knowledge of this hypothetical person.") (internal citations omitted); *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997) ("To suggest that the [person of ordinary skill in the art] construct applies to particular individuals could mean that person of *exceptional* skill in the art would be disqualified from testifying as an expert because [he is] not ordinary enough.") (emphasis in original). Here, Dr. Denton opined from the vantage point of the hypothetical person of ordinary skill in the art, and so the fact that he may be a "super-expert" does not mean that his testimony can be disregarded by the jury. A848-A849(704:16-705:17); A876-A877(732:21-733:3).

### c. Dr. Denton Did Not Rely on Improper "Hindsight" in his Analysis.

The district court criticizes Dr. Denton for relying on "hindsight" in identifying the "problem" solved by the '670 patent. A28-A30. The district court is apparently of the view that the problem solved by the '670 patent must be ascertained *without* reference to the patent or its claims, to avoid the improper use of hindsight. As a result, however, the district court proceeds to identify various "problems" that are neither disclosed in the specification nor necessarily solved by the claimed regenerative drying system, including (1) "use in the field," (2) "sensitivity of the IMS detector," (3) "import[ing] negative characteristics into the detector," (4) "substantially increased cost," and (5) "substantial increased size." A29. This analysis is fundamentally incorrect, since the claims are not limited to, *e.g.*, particularly sensitive, inexpensive, or small detectors. Nor does the patent's description of the regenerative drying system, which is concise and rudimentary at best, discuss any of these issues. As described above, the analogous art analysis *must* be performed with reference to the claims and specification, and thus is "necessarily conducted by hindsight." *In re Oetiker*, 977 F.2d 1443, 1447 (Fed. Cir. 1992); *see also In re GPAC*, 57 F.3d at 1578; *In re ICON Health & Fitness*, 496 F.3d at 1380; MPEP § 2141.01(a).

-26-

### d. The District Court Erred By Relying on the Testimony of Fact Witnesses Mr. Jenkins and Dr. Nacson.

The district court relied on the deposition testimony of lead inventor Mr. Jenkins and former Smiths' scientist Dr. Nacson in support of the jury's finding on analogous art. A30-A35. Such reliance was erroneous because the analogous art inquiry is made from the perspective of a *hypothetical person of ordinary skill in the art*, not any real individuals. *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006); *Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1327 (Fed. Cir. 2012); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1364 (Fed. Cir. 2001); *Std. Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). Furthermore, the district court's analysis is flawed because it perpetuates the error of identifying numerous "problems" that are not discussed or claimed in the '670 patent, such as "miniaturizing" the dryers and maintaining an "exacting quality of air." A31-A35. The district court's reliance on these unclaimed and undisclosed features simply cannot support its conclusion of nonobviousness. *TorPharm v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1331 (Fed. Cir. 2003) ("Thus, *Graham* stands for the unexceptional proposition that nonobviousness is assessed by reference to the claimed invention, and not by reference to properties that cannot ultimately be derived from the claims."). *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1381 (Fed. Cir. 2013) ("But an unclaimed and undisclosed feature such as

the 'specialized screw' cannot be the basis for finding Synthes's patent to be non-obvious over the prior art.").

The district court also argues that the testimony of Mr. Jenkins and Dr. Nacson pertaining to "pressure swing" dryers supports the jury's finding that Seibert is not analogous art. A30-A32. This argument is flawed because it *assumes* (without any record evidence) that Seibert discloses and is limited to a "pressure swing" dryer. Seibert *never* uses the term "pressure swing." Such a characterization of Seibert (which is not even true) is beyond the comprehension of lay jurors, and thus must be supported by expert testimony. *Wyers*, 616 F.3d at 1240 n.5. Because Morpho failed to offer any expert testimony characterizing Seibert as a "pressure swing" dryer, the testimony of Mr. Jenkins and Dr. Nacson regarding such "pressure swing" dryers bears no relevance to whether Seibert is analogous prior art.[7]

The district court goes on to state that "Smiths scientists did not independently identify [Seibert]," and that Smiths did not "even consider[]

---

[7]     Furthermore, even assuming that Seibert discloses a "pressure swing" dryer (which it does not), the district court agreed that Seibert is not *limited* to a "pressure swing" dryer. A30(n.9). Accordingly, even under the district court's erroneous characterization of Seibert, the district court's analysis admittedly fails to consider Seibert for all that it teaches. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012) ("A reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment.").

regenerative drying as a possibility." A32; A34. This argument should be rejected because whether specific individuals had actual knowledge of Seibert is irrelevant to whether Seibert qualifies as analogous art. *In re Carlson*, 983 F.2d 1032, 1037-38 ("[A]ctual knowledge of the [prior art] is not required for the disclosure to be considered prior art."). Seibert is relevant because of *what it discloses*, not because certain people were aware of it. *Id*.

> e. **The District Court Erred by Relying on Purported Failures of Smiths.**

The district court also cites to purported failures of Smiths to solve the unclaimed and undisclosed "problems" identified by the district court. A35-A38. However, the district court cites no authority whatsoever for the proposition that the jury can rely on the secondary consideration of "failure of others" in connection with the issue of analogous art.

Furthermore, the district court concludes that "it was not unreasonable for the jury to use its 'common sense' in determining that more than a decade of evidence, demonstrating that skilled practitioners in the art were not turning to a 20-year-old 'gas fractionator' patent from outside the field, suggests that such prior patent did not 'logically commend itself' to the problem at hand." Here, the district court erroneously relies again on evidence of whether real people were aware of Seibert and its teachings to support a conclusion that Seibert is not analogous prior art. The district court fails to acknowledge that the *hypothetical*

person of ordinary skill is *charged* with knowledge of relevant prior art, even
though it may not be generally known in the industry. *In re Carlson*, 983 F.2d
1032, 1037 (Fed. Cir. 1992); *Lockheed Aircraft Corp. v. U.S.*, 553 F.2d 69, 83 (Ct.
Cl. 1977).

For all of these reasons, the Seibert reference, which straightforwardly
describes the exact dual-dryer system described in the Morpho patent and explains
that this drying system can be used to generate continuous dry air streams for lab
instruments, is analogous prior art as a matter of law.

### B. The Differences Between the Prior Art and the Claimed Invention

On the issue of whether the combination of Seibert and Davies discloses all
the elements of the Asserted Claims, the district court found that there was
substantial evidence supporting the jury's verdict that these references did not
disclose all the claim elements. The district court's conclusion should be rejected
because Dr. Denton provided unrebutted expert testimony that the combination of
Davies and Seibert (assuming infringement)[8] discloses every limitation of the

---

[8]    IMS detectors can have two types of desorbers: those on which the swab sits
and is heated ("hot plate" type desorbers) and those that have a slot into which the
swab is inserted ("oven" or "toaster" type desorbers). A857-A860(713:21-716:4).
Both were known in the prior art. A13735(Fig. 1); A12000(Fig. 1). At trial,
Smiths argued that the accused IonScan 500DT does not meet the limitations of
desorber "inlet" or desorber "outlet" in claim 12 (because the claim requires an
"oven" type desorber and the 500DT uses a "hot plate" type desorber), or "detector
for detecting particles of interest" in claim 20. However, the accused structure of
the 500DT is the same as that disclosed in Davies with respect to these limitations.

Asserted Claims. A854-A876. Morpho did not dispute that the combination of Seibert and Davies discloses each and every limitation of the Asserted Claims, and offered no expert testimony on the issue. Nevertheless, the jury found that the combination of Seibert and Davies did not disclose all the limitations of each Asserted Claim. A6.

Given Dr. Denton's unrebutted testimony, a reasonable jury could not have found infringement while at the same time finding that the combination of Seibert and Davies did not disclose all the claim elements. This inconsistency lends further support to Smiths' position that the jury's finding that Seibert was not analogous prior art had an improper domino effect on the rest of the questions related to obviousness in the verdict form, including the question of whether the combination of Seibert and Davies disclosed all the claim elements. *See Asyst Techs.*, 544 F.3d at 1313.

The jury's error is further demonstrated by the district court's inability to articulate any rational basis for the jury's finding when the issue was undisputed by Morpho. Here, the district court notes that because the *claims of Seibert* recite "a feature *not claimed* by Morpho," that this observation somehow supports the jury's

---

Thus, if the 500DT meets these limitations, then Davies necessarily discloses these limitations. *See Evans Cooling Sys., Inc. v. General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997); *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000). In other words, Morpho has accused a structure of infringing that is obvious in light of the prior art, rendering the '670 patent invalid.

finding.  A41(n.14).  The district court's view of the law is erroneous for two

reasons.  First, restricting a prior art patent to only its *claimed* disclosure is

erroneous.  *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir.

1985).  Second, the district court admittedly makes distinctions in the prior art that

are *unclaimed* in the '670 patent.  *TorPharm*, 336 F.3d at 1331; *Smith & Nephew*,

721 F.3d at 1381.

### C.  The Level of Ordinary Skill in the Art

The parties stipulated that a person of ordinary skill in the art taught by the

'670 patent would have (1) at least a B.S. in mechanical engineering, chemical

engineering, physics, or chemistry (or equivalent experience), and (2) at least three

years of work experience in designing pneumatics and gas purification systems for

analytical instruments.  During JMOL proceedings, Morpho admitted that this

level of ordinary skill is "relatively high," and thus the third *Graham* factor can

only weigh in favor of obviousness.  *Innovention Toys*, 637 F.3d at 1323 ("A less

sophisticated level of skill generally favors a determination of nonobviousness, and

thus the patentee, while a higher level of skill favors the reverse.").  A11482.

### D.  Motivation to Combine

At trial, Smiths provided evidence of at least three motivations to combine

Seibert and Davies.  First, and most importantly, Seibert explicitly teaches that its

regenerative drying system can be used "for *drying gases* of all types, such as for

drying small flows of compressed gases in *instrument* air." A11979(10:15-17); A848-A849(704:16-705:17); A876-A877(732:23-733:3, 733:13-733:21). Further, Davies refers to IMS detection systems as "*instruments*" where the "air *has to be dried* to a high degree before use." A12006-A12007(2:9, 2:12, 2:18-19, 2:24, 3:50, 3:66); A12009(7:59). *In re Thrift*, 298 F.3d 1357, 1364 (Fed. Cir. 2002) ("The motivation to combine the references is present in the text of each reference."). These explicit disclosures in the prior art cannot be stressed enough, especially when the person of ordinary skill in the art has experience with "*gas purification* systems for analytical *instruments.*" *See Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1353 (Fed. Cir. 2013) ("The gravamen of the parties' dispute here involved whether a skilled artisan would have been motivated to combine certain prior art references, an issue that *focuses heavily on the first and third Graham factors.*").

Second, other prior art references suggest the combination of a detector with a dual-bed regenerative drying system. *Id.* ("[M]otivation to combine may be found explicitly or implicitly in . . . the *interrelated teachings of multiple patents.*") (internal citations omitted); *Randall Mfg. v. Rea*, 733 F.3d 1355, 1363 (Fed. Cir. 2013) (Other prior art "references constitute important evidence of the state of the art and the context in which the Examiner-cited combination should be evaluated."); *DyStar Textilfarben GmbH& Co. Deutschland KG v. C.H. Patrick*

*Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006) ("The motivation need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, *the prior art as a whole*, or the nature of the problem itself."). For example, the *Hayhurst* article explicitly teaches the use of dual-bed regenerative drying with an IMS detector. A12015(Fig.1); A12016; A879(735:7-12); A889(745:15-16); A896(752:4-5). Additionally, U.S. Patent No. 4,983,190 to Verrando explicitly teaches the use of dual-bed regenerative drying with a "chemical agent vapor detector," and one of ordinary skill in the art would understand that such a detector could even be an IMS detector. A11983-A11984(Fig. 2, Fig. 4); A11988(3:32-38); A11991(10:3-18); A878(734:7-13); A889(745:11-12). As yet another example, U.S. Patent No. 5,403,386 to Collier explicitly teaches the use of dual-bed regenerative drying with a variety of detectors, such as a gas chromatograph, liquid chromatograph, infrared detector, or gas chromatograph / mass spectrophotometer, "and the like." A11995-A11996(Fig.1, Fig.2); A11998(3:15-16, 3:44-48, claim 6); A878(734:14-25); A889(745:12-15).

Third, the nature of the problem itself suggests the combination of Seibert with Davies. Dr. Bell testified that dryer saturation in detection systems was a known problem in the field before the '670 patent. A473-A475(329:1-331:15); A539(395:8-23). Dr. Denton further testified that if one needed a continuous flow

of dry air to use with a detector, that use of the regenerative drying system of Seibert was the common sense choice. A877-A878(733:4-12, 734:2-5). Thus, because dual-bed regenerative drying systems were already available in the prior art, the known problem of dryer saturation in detection systems establishes motivation to combine Seibert and Davies as a matter of law. *Bayer Healthcare Pharms., Inc. v. Watson Pharms.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013) ("[A]ny *need or problem known* in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.") (citing *KSR*, 550 U.S. at 420).

The district court's reasoning for sustaining the jury finding is primarily based on mischaracterizing the "problem" solved by the '670 patent, and then claiming that because Smiths' evidence was based on a different "problem," that Smiths' evidence could be rejected by the jury. A44-A51. The fundamental flaw with the district court's analysis is that it addresses only the third motivation to combine—the court simply ignores the first and second motivations discussed above. The case law is clear that focusing on the "problem" addressed by the claimed invention is only *one way* to show a motivation to combine, and thus it is illogical for the district court to suggest that disproving that motivation results in the nonobviousness of the claims at issue. *KSR*, 550 U.S. at 420; *Norgren*, 699

F.3d at 1326-27; *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368-69 (Fed. Cir. 2012).[9]

Furthermore, the district court's analysis ignores the fact that Morpho introduced no expert opinion on the lack of a motivation to combine. Without such expert testimony to rebut Dr. Denton, the jury's finding is not supported by substantial evidence. *Wyers*, 616 F.3d at 1240 n.5 ("[E]xpert testimony may be critical, for example, to establish . . . the existence (*or lack thereof*) of a *motivation to combine references*.") (internal citations omitted).

### E. Secondary Considerations of Nonobviousness

#### 1. Morpho Failed to Prove that its Itemiser 3 Product is Covered by the Asserted Claims.

Having failed to offer any expert testimony with respect to obviousness, Morpho's non-obviousness case relied almost exclusively on its own Itemiser 3 product to show commercial success, industry praise, and copying. However, the Itemiser 3 is only relevant to these secondary considerations if it is covered by the

---

[9] Moreover, even accepting the district court's erroneous hypothesis, the district court's analysis with respect to the third motivation to combine should be rejected in any event. As described above, Smiths' correctly identified the "problem" at issue. The district court misunderstands the prohibition against "us[ing] the invention to define the problem that the invention solves." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012); A43. The issue discussed in *Mintz* had to do with improperly labeling the inventor's particular solution as the "problem" solved by the claimed invention. For example, if one characterized the problem solved by the '670 patent as "how to recharge a dryer while another dryer is operating," that would be erroneous under *Mintz*.

Asserted Claims in the first place. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 n.42 (Fed. Cir. 1985); *Muniauction*, 532 F.3d at 1328; *Amazon.com*, 239 F.3d at 1366. Morpho did not enter the Itemiser 3 or any schematics or other technical documents about the Itemiser 3 into evidence. In short, because Morpho failed to prove that the Itemiser 3 is covered by the Asserted Claims, the purported secondary considerations of commercial success, industry praise, and copying should be rejected as a matter of law.

On direct examination, Morpho's expert Dr. Bell testified that the Itemiser 3 is an embodiment of "the '670 patent" without specifying any particular claims that purportedly cover the Itemiser 3 and without providing any comparison of any claim and the Itemiser 3.[10] A463(319:16-19). On cross examination, Dr. Bell admitted that the Itemiser 3 does *not* embody claim 12. A507-A508(363:23-364:17). The Itemiser 3, therefore, also does not embody claims 13, 14, and 17, each of which depend on claim 12. This, alone, eviscerates nearly all of the purported evidence of secondary considerations with respect to these claims. While Dr. Bell gave a one-liner that the Itemiser 3 is an embodiment of claim 20 (A508(364:3)), this testimony should be rejected as a matter of law because it is nothing more than a conclusory opinion unsupported by any facts in the record.

---

[10] Nor could she do so, because the only statement on this point in her expert report was one sentence that stated without explanation that the Itemiser 3 was a "commercial embodiment of the claims of the '670 patent." A3695(¶ 222).

-37-

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it *cannot support a jury verdict*."); *Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) ("Nothing in the rules or in our jurisprudence requires the fact finder to credit the unsupported assertions of an expert witness."); *Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1348 (Fed. Cir. 2008) ("[E]xpert opinion contrary to the factual evidence need not be credited.") (citing *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1294 (Fed. Cir. 2007)); *Upjohn Co. v. MOVA Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000) ("At this critical point in the determination of obviousness, there must be factual support for an expert's conclusory opinion.").

Dr. Bell's failure to articulate any analysis with respect to claim 20 comes as no surprise, because the record evidence does not support Dr. Bell's conclusory opinion that claim 20 covers the Itemiser 3. Specifically, claim 20 recites the step of "directing the stream of dry air from the operated dryer toward an object to be tested and then toward the detector." A1303(claim 20). Michael Patterson, Morpho's technology manager for trace detection, testified that the Itemiser 3 does *not* direct dry air toward the sample trap, which is the "object to be tested" in the Itemiser 3 product. A385-A386(241:9-242:8). Rather, in the Itemiser 3 the trap is

-38-

isolated from the dry air stream. *Id.* Dr. Bell agreed with Mr. Patterson.

A507(363:6-21). Accordingly, Dr. Bell's bald conclusion notwithstanding, there is

not sufficient record evidence to support a conclusion that the Itemiser 3 embodies

claims 20, 21, or 23. A463(319:16-19); A508(364:3); *Brooke Group Ltd.*, 509

U.S. at 242; *Rohm and Haas*, 127 F.3d at 1092; *Johns Hopkins*, 543 F.3d at 1348;

*Upjohn*, 225 F.3d at 1311.

In response to this argument, Morpho has argued that claim 20 contains no

requirement that the air actually enter the desorber or flow through a trap. In its

view, claim 20 covers devices where the desorber and trap are completely isolated

from the dry air from the dryer. The dispute with respect to claims 20, 21, and 23

thus appears to center around the proper interpretation of the phrase "directing the

stream of dry air from the operated dryer *toward* an object to be tested for particles

of interest and then toward the detector." A1303(claim 20).[11] The whole point of

this element is that the dry air goes to the trap (the object to be tested) en route to

the detector to pick up the particles of interest and carry them to the detector.

A1302(5:9-35). Thus, Smiths proposes that the term "toward" should be construed

simply as "to." Morpho's construction renders the requirement that the air go

toward the "object to be tested for" in the claim superfluous or utterly trivial.

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275

---

[11]    This dispute between the parties did not become apparent until Morpho filed
its JMOL opposition on January 30, 2013. A11488.

-39-

(Fed. Cir. 2012) ("In *Phillips*, this court reinforced the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous."). Under Morpho's view, the claim term is met merely if dry air travels "in the direction of" the trap without actually coming into contact with the trap. This interpretation should be rejected because it leaves the "object" with no purpose in the claim. Claim 20 does not cover a device, such as the Itemiser 3, where the object to be tested for particles of interest is isolated from the dry air stream.

Alternatively, even if the Court accepts Morpho's interpretation of claim 20, Morpho has still failed to provide sufficient evidence that claim 20 covers the Itemiser 3. Critically, Morpho did *not* introduce any product sample or schematic of the Itemiser 3 into evidence. Instead, Morpho relied on Figure 1 of *the '670 patent* (describing prior art) in an attempt to show the air flow in the Itemiser 3. However, whether dry air flows "from" the dryer "toward" (i.e., "in the direction of") the trap in the Itemiser 3 cannot be ascertained from a rudimentary schematic like Figure 1 of the '670 patent. Whether, in the actual Itemiser 3, air flow is directed "from" the dryer "toward" the trap can only be ascertained with evidence of what the innards of the product actually look like. In other words, it would be necessary to submit evidence regarding the physical orientation of the drying system, pneumatic tubes, and the desorber in the Itemiser 3 before the jury could

even begin to determine whether dry air is directed "from" the dryer "toward" the trap. Here, Morpho introduced no evidence. Thus, even under Morpho's incorrect construction of "toward," the secondary considerations of commercial success, copying, and industry praise must be rejected as a matter of law because Morpho did not prove that the Itemiser 3 is covered by the Asserted Claims. *Ashland Oil*, 776 F.2d at 306 n.42; *Muniauction*, 532 F.3d at 1328; *Amazon.com*, 239 F.3d at 1366.

Although these arguments were made during JMOL proceedings, they were largely ignored by the district court. A53-A54. In stating that the "Itemizer 3 is an embodiment of *the '670 patent*," the district court ignored the fact that Morpho's expert *admitted* that the Itemiser 3 is not covered by claim 12. A507-A508(363:23-364:17); A54. The district court further stated that even if the Itemiser 3 does not meet the air flow limitation in claim 20, it is of no consequence because the Itemiser 3 still meets the regenerative dryer limitations in claim 20. A53(n.22). Thus, according to the district court: (1) it is irrelevant that the Itemiser 3 is not covered by claim 12 if the Itemiser 3 is covered by claim 20, and (2) it is irrelevant that the Itemiser 3 does not meet a particular limitation of claim 20 because the Itemiser 3 meets the other limitations of claim 20. Effectively, the district court advances the theory that the Itemiser 3 can be used to support secondary considerations of nonobviousness for *any* claim so long as the Itemiser 3

meets "most" of the limitations of some claims. This theory must be rejected

because secondary considerations of nonobviousness of a particular claim can only

be based on a product if the product meets *all* of the limitations of that particular

claim. *Ashland Oil*, 776 F.2d at 306 n.42; *Muniauction*, 532 F.3d at 1328;

*Amazon.com*, 239 F.3d at 1366.

> ### 2. Because the Connection of a Dual-Bed Regenerative Drying System To a Detector Was Already Known in the Prior Art, There Cannot be any Nexus Between any Purported Secondary Consideration and the Asserted Claims.

Another overarching issue with respect to secondary considerations is the

lack of a nexus for any purported secondary consideration because the purported

novelty of the Asserted Claims is actually *not* novel. Fundamentally, "[f]or

objective evidence of secondary considerations to be accorded substantial weight,

its proponent must establish a nexus between the evidence and the merits of the

*claimed invention*." *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (internal

quotations omitted) (emphasis in original). No nexus exists if the purported

secondary considerations are instead tied to material that was known in the prior

art. In other words, when "the offered secondary consideration actually results

from something other than what is both claimed and *novel* in the claim, there is no

nexus to the merits of the claimed invention." *Id.* (emphasis in original); *Rambus*

*Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013) ("[O]bjective evidence of

nonobviousness lacks a nexus if it exclusively relates to a feature that was known

in the prior art.") (internal quotation omitted). The only purported point of novelty to the Asserted Claims is the mere connection of a dual-bed regenerative drying system to a detector. However, Dr. Denton gave unrebutted expert testimony that this simple connection of a dual-bed regenerative drying system to a detector was disclosed in three prior art references. A12015-A12016(Fig.1, 131); A879(735:7-12); A889(745:15-16); A896(752:4-5); A11983-A11984(Fig. 2, Fig. 4); A11988(3:32-38); A11991(10:3-18); A878(734:7-13); A889(745:11-12); A11995-A11996(Fig. 1, Fig. 2); A11998-A11999(3:15-16, 3:44-48, claim 6); A878(734:14-25; A889(745:12-15). Therefore, the regenerative drying feature of the Asserted Claims is *not* novel and thus cannot serve as the basis for any nexus between any purported secondary consideration and any Asserted Claim. *In re Kao*, 639 F.3d at 1068; *Rambus*, 731 F.3d at 1257.

This case is thus similar to *Asyst* on this issue. In *Asyst*, the patentee attempted to link the secondary considerations of commercial success, long-felt need, and industry praise to a feature of the claims that was disclosed in a piece of prior art. This Court rejected the patentee's position, holding that "even though commercial embodiments of the '421 invention may have enjoyed *commercial success*, Asyst's failure to link that commercial success to the features of its invention *that were not disclosed in Hesser* undermines the probative force of the evidence pertaining to the success of Asyst's and Jenoptik's products. . . . The

-43-

same flaw attends Asyst's reliance on the evidence of *long-felt need* for the invention and the evidence of *industry praise*." *Asyst Techs*, 544 F.3d at 1316. Similarly, here Morpho attempts to link its secondary considerations to the dual-bed regenerative dryer feature in the claims despite the fact that this feature is disclosed in the prior art. For example, the regenerative dryer limitations of claims 12 and 20 are indisputably disclosed in Collier. A11995-A11998(Fig.1, Fig.2, 2:28-3:43). Because Morpho fails to link its secondary considerations to a feature that is *not* disclosed in Collier, *all* of the secondary considerations found by the jury should be rejected as a matter of law for lack of the requisite nexus. *In re Kao*, 639 F.3d at 1068; *Asyst Techs*, 544 F.3d at 1316; *Rambus*, 731 F.3d at 1257.

### 3. The Jury's Finding of Commercial Success is not Supported by Substantial Evidence.

In addition to the reasons set forth above, the jury's finding of commercial success with respect to the Itemiser 3 should be rejected as a matter of law because, even assuming that the Itemiser 3 is covered by the Asserted Claims (which it is not), the only economic information offered into evidence was the number of units of the Itemiser 3 that were sold. A316-A317(172:11-173:8). This evidence, standing alone, is insufficient to establish commercial success as a matter of law. *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991) ("[I]nformation solely on numbers of units sold is insufficient to establish commercial success."); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)

-44-

("[E]vidence related solely to the number of units sold provides a very weak showing of commercial success, if any."); *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed. Cir. 1983) ("There was no evidence of market share, of growth in market share, of replacing earlier units sold by others or of dollar amounts, and no evidence of a nexus between sales and the merits of the invention.").

### 4. The Jury's Finding of Copying is not Supported by Substantial Evidence.

In addition to the reasons set forth above, the jury's finding of copying of the Itemiser 3 should be rejected as a matter of law because, even assuming that the Itemiser 3 is covered by the Asserted Claims (which it is not), Morpho failed to offer any evidence *comparing* the two separate regenerative drying systems of the Itemiser 3 and the IonScan 500DT. Indeed, Morpho failed to submit into evidence any schematic or product sample of the Itemiser 3. Morpho's evidence at trial showed only that Smiths had access to, and analyzed, a competing product. But without any evidence showing the extent of *similarity* between the two drying systems, there is no legally sufficient evidence supporting the jury's finding of copying. *Cable Electric Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1985) ("Access to, and analysis of, other products in the market is hardly rare, even in the design stages of competing devices. Access in combination with similarity can create a strong inference of copying, but here Cable . . . *failed to submit into evidence a sample of its own device for comparative purposes in*

-45-

*evaluating the extent of similarity*."); *Wyers*, 616 F.3d at 1246 ("[C]opying requires evidence of efforts to *replicate* a specific product . . . .").

**5.** **The Jury's Finding of Industry Praise is not Supported by Substantial Evidence.**

In addition to the reasons set forth above, the jury's finding of industry praise for the Itemiser 3 should be rejected as a matter of law because, even assuming that the Itemiser 3 is covered by the Asserted Claims (which it is not), the only evidence Morpho offered at trial on this issue fails on its face to establish industry praise. At trial, Morpho's counsel asked precisely one question about "industry praise." A918(774:7). That question referred to a lone email that refers to one customer's preference for the Itemiser 3 over the IonScan 400B. A13981-A13982. However, that email on its face identifies numerous features of the Itemiser 3 *in addition to* the regenerative drying feature that caused the customer to prefer the Itemiser 3, including that it (1) "looks good," (2) has swabs that "last a lot longer than our swabs," (3) "is lighter than ours so moving the machine around the airport is easy," (4) "has a built in printer," (5) "can be hooked up to a network, they can download their results into excel," (6) has a vacuum sampler that "is smaller lighter and not as loud as ours," and (7) "is also not as loud as the 400B." A13981. A lone email such as this fails to establish industry praise as a matter of law because it is not sufficiently linked to the patented invention as opposed to unclaimed features. *See Geo M. Martin*, 618 F.3d at 1305 ("Industry praise must

-46-

also be linked to the patented invention. The only evidence of industry praise . . .
is an internal Alliance email in which an Alliance employee reports a customer's
statement that 'the Martin beaker is the cat's meow.' But that same email notes
that the customer *also chose* the Martin Quik-Break because 'the interface between
the stacker and the breaker will be handled by a single vendor.'") (internal citation
omitted).

### 6. The Jury's Findings of Long-Felt Need and Failure of Others are not Supported by Substantial Evidence.

As described above, the only *purported* novelty in the Asserted Claims is the
mere connection of a dual-bed regenerative drying system to a detector. However,
as described above, this feature is actually *not* novel. A12015-A12016(Fig.1, 131);
A879(735:7-12); A889(745:15-16); A896(752:4-5); A11983-A11984(Fig. 2, Fig.
4); A11988(3:32-38); A11991(10:3-18); A878(734:7-13); A889(745:11-12);
A11995-A11996(Fig. 1, Fig. 2); A11998-A11999(3:15-16, 3:44-48, claim 6);
A878(734:14-25); A889(745:12-15). In other words, others had already "solved"
the problem of dryer saturation in detection systems, thereby achieving continuous
operation. Because others had already solved this problem, there cannot be any
long-felt need or failure of others which supports the nonobviousness of the
Asserted Claims. This legal concept was explained in *Geo M. Martin*:

> *Where the differences between the prior art and the claimed*
> *invention are as minimal as they are here, however, it cannot be said*
> *that any long-felt need was unsolved.* Martin presented evidence that

its Quik-Break worked better than any prior art system because, for example, it could simultaneously break three bundles or more. The record shows, however, that *this "need" had been met by prior art machines* such as the Pallmac and the Visy that could break more than one bundle at a time. The Trust's evidence of *failure of others is similarly insufficient.*

*Geo M. Martin*, 618 F.3d at 1304-05; *see also*, *Newell Cos. Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1998) ("[O]nce another supplied the key element, there was no long-felt need or, indeed, a problem to be solved . . . ."). Quite simply, because Morpho was *not the first one* to solve the dryer saturation problem with a dual-bed regenerative drying system, the jury's findings of long-felt need and failure of others should be rejected as a matter of law.

The district court's analysis on these secondary considerations is further flawed because the purported "failures" are related to *unclaimed* subject matter. Specifically, the district court relies on purported failures to solve the problems of not "sacrificing performance of the IMS detector" and achieving an "exacting quality of clean dry air." A56. As the Asserted Claims do not require a particular level of performance of an IMS detector or particular quality of clean dry air, the purported "failures" to solve such problems are irrelevant because they are not commensurate with the scope of the claims. *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) ("Because the claims are broad enough to cover devices that either do or do not solve the 'short fill' problem, Abbott's objective evidence of non-obviousness fails because it is not

-48-

commensurate in scope with the claims in which the evidence is offered to support.") (internal citations omitted). The claimed invention does not address any problems of sacrificing detector performance or achieving an exacting quality of clean dry air, and thus these properties cannot be the basis for a nonobviousness determination. *TorPharm*, 336 F.3d at 1331; *Smith & Nephew*, 721 F.3d at 1381.

### 7. Any Secondary Considerations Cannot Overcome the Prima Facie Case of Obviousness.

As shown above, here there is little, if any, *legally sufficient* evidence of secondary considerations. Therefore, this case is like those where the evidence of secondary considerations is so lacking that it simply cannot overcome the *prima facie* case of obviousness as a matter of law. *See, e.g.*, *Western Union*, 626 F.3d at 1373; *Wyers*, 616 F.3d at 1246; *Agrizap*, 520 F.3d at 1344; *Leapfrog Enters.*, 485 F.3d at 1162. Indeed, "[f]ew cases present such extensive objective evidence of nonobviousness, and thus we have *rarely held* that objective evidence is sufficient to overcome a prima facie case of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1354 (Fed. Cir. 2012). In the end, because "the inventions represented no more than 'the predictable use of prior art elements according to their established functions,' *KSR*, 550 U.S. at 417, the secondary considerations are inadequate to establish nonobviousness as a matter of law." *Wyers*, 616 F.3d at 1246; *see also Western Union*, 626 F.3d at 1373; *Odom v. Microsoft Corp.*, 429 Fed. Appx. 967, 973 (Fed. Cir. 2011); *Stone*

*Strong, LLC v. Del Zotto Prods. of Fla., Inc.*, 455 Fed. Appx. 964, 971 (Fed. Cir. 2011). If the validity of patents such as the '670 patent were to stand in the face of the prior art, the principles articulated in *KSR* would be rendered meaningless.

## III. THE DISTRICT COURT ERRED BY EXCLUDING THE TESTIMONY OF DR. HARRINGTON REGARDING NONINFRINGEMENT AND DR. RUTHVEN REGARDING INVALIDITY

### A. The District Court Applied an Erroneous View of the Law Which is a *Per Se* Abuse of Discretion.

On the eve of trial, the district court excluded the testimony of Smiths' experts Dr. Peter Harrington and Dr. Douglas Ruthven regarding noninfringement and invalidity respectively. Dr. Harrington was permitted to testify only as to the general operation of IMS detectors, and Dr. Ruthven was permitted to testify only to the general science of air drying. A71-A72. Relying on *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2009), the district court ruled that Smiths' experts "could not testify to 'infringement' or 'obviousness' because they did not possess the *minimal qualifications* necessary to be deemed 'a person of ordinary skill in the art.'" A63-A64. This was error. *Sundance* does not establish a special rule in patent cases that a witness is unqualified to testify on issues of noninfringement or invalidity unless the witness meets the "minimal qualifications" of the hypothetical person of ordinary skill in the art. *Id.* at 1360 ("Patent cases, like all other cases, are governed by Rule 702. There is, of course,

-50-

no basis for carving out a special rule as to experts in patent cases."). Rather, *Sundance*, in excluding testimony from an *attorney with no technical knowledge at all*, stands for the unexceptional proposition that "it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art." *Sundance*, 550 F.3d at 1363.

As explained by this Court after *Sundance*, the correct standard for admissibility of expert testimony on issues of noninfringement or invalidity is simply that the witness must establish an "adequate relationship between his experience and the claimed invention." *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010); *accord Mytee Products, Inc. v. Harris Research, Inc.*, 439 Fed. Appx. 882, 887 (Fed. Cir. 2011). In *SEB*, a witness was allowed to testify as to infringement even though he "lacked expertise in the art of designing deep fryers." *Id*. In *Mytee Products*, a witness was allowed to testify as to infringement and validity even though he "was not a person of ordinary skill in the art of the invention in light of his lack of experience in carpet cleaning." *Mytee Products*, 439 Fed. Appx. at 886. Indeed, in *SEB* the Court distinguished the exclusion of testimony in *Sundance* as an "unusual situation" in which the proposed expert had no relevant technical experience *at all*. *SEB*, 594 F.3d at 1373. Therefore, a witness may be permitted to testify on issues of noninfringement or

invalidity notwithstanding the fact that the witness may not meet the "minimal qualifications" of the hypothetical person of ordinary skill in the art.

Indeed, the standard advanced by the district court is not only incorrect, it is unworkable.  Here, the parties *agreed* as to the qualifications of the hypothetical person of ordinary skill in the art.  However, the determination of the qualifications of one of ordinary skill in the art is often a disputed factual issue for the jury.  *Al-Site*, 174 F.3d at 1324.  Thus, adoption of the district court's view would put the cart before the horse—the question of whether an expert's testimony may be submitted to the jury would depend on the jury's determination of the experience and skill level of the hypothetical ordinarily skilled artisan.[12]

Because the district court applied the incorrect legal standard for determining the admissibility of Dr. Harrington and Dr. Ruthven's proposed testimony, this error was a *per se* abuse of discretion.  *Dixon v. Edwards*, 290 F.3d 699, 718 (4th Cir. 2002) ("Of course, a mistake of law by the district court is per se an abuse of discretion."); *United Transp. Union v. South Carolina Public Railway Commission*, 130 F.3d 627, 631 (4th Cir. 1997) ("However, a district court's action that is based on an error of law is a *per se* abuse of discretion."); *Eli Lilly and Co. v. Teva Pharmas. USA, Inc.*, 557 F.3d 1346, 1350 (Fed. Cir. 2009) ("[A] district court

---

[12]   Further, often inventions involve multiple diverse fields, making it difficult to find a real-life expert who has the requisite experience in all of the fields that the hypothetical artisan possesses.

would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.") (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

### B. Dr. Harrington and Dr. Ruthven were Qualified to Testify as to Noninfringement and Obviousness.

The district court found that "Dr. Harrington is qualified to testify as an expert on the science and operation of the IMS detection instruments generally, which falls within his expertise as an expert in ion mobility spectrometry." A71.[13] The district court further found that Dr. Ruthven is "an expert in the science of adsorption and adsorption processes, including air drying." A72. Accordingly, the district court did not dispute that Dr. Harrington and Dr. Ruthven were each experts in their respective fields of IMS and air drying. The issue then, becomes whether their testimony has "an adequate relationship between [their] experience and the claimed invention." *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010).

---

[13] Dr. Harrington actually qualifies as an expert on noninfringement even under the district court's erroneous view of the law. After the district court's ruling, Smiths moved for reconsideration because Dr. Harrington actually did meet the definition of a person of ordinary skill in the art, as evidenced by a declaration he submitted. A231(87:3-16). Although the district court did not doubt that Dr. Harrington met the definition of one of ordinary skill in the art, the district court denied the motion for reconsideration as a "procedural issue." A231(87:7, 87:13-14).

Dr. Harrington's proposed testimony on noninfringement was that the IMS-related functionality of the accused IonScan 500DT did not meet certain claim limitations, including:

- "desorber having an inlet for communicating with one of the traps to be tested for materials of interest" (claim 12)

- "outlet communicating with the detector inlet" (claim 12)

- "continuously operating" (claims 20)

- "detecting particles of interest" (claim 20)

A11277- A11278(¶¶ 23, 25, 26, 28).  As Dr. Harrington is an expert in IMS, his testimony has "an adequate relationship between his experience and the claimed invention." *SEB*, 594 F.3d at 1373.

As noted by the district court, Dr. Ruthven's proposed testimony included "the substance and disclosure of the prior art, to include how a person of ordinary skill in the art would understand the prior art and whether such a person would be motivated to combine such art."  A72; A11368(¶ 9); A11370-A11377(¶¶ 18-23); A11430-A11432 (¶¶ 7-9); A11434-A11441(¶¶ 14-28).  In particular, Dr. Ruthven's testimony involved air drying prior art and its relevance to the obviousness analysis.  Because Dr. Ruthven's testimony related to how the regenerative drying features of the claims were obvious, Dr. Ruthven's testimony has "an adequate relationship between his experience and the claimed invention." *SEB*, 594 F.3d at 1373.

-54-

**C.     The Exclusion of the Testimony of Dr. Harrington and Dr. Ruthven was Reversible Error and Warrants a New Trial.**

At trial, Morpho offered testimony from Dr. Bell that the IonScan 500DT infringes the Asserted Claims.  Because the district court erroneously excluded Dr. Harrington's testimony, Smiths was left with no expert testimony to rebut Dr. Bell.  Indeed, the district court agreed with Morpho that Dr. Harrington's testimony on noninfringement would have been "highly persuasive."  A70.  It therefore is beyond dispute that the improper exclusion of Dr. Harrington's testimony prejudiced Smiths' ability to present its noninfringement defense.  *See Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1376 (Fed. Cir. 2012) ("[W]hile Meyer's expert was permitted to testify as to why the patent was not obvious, the exclusion of Anders' testimony made it look as though Bodum had no rebuttal.").

Smiths was similarly harmed by the exclusion of Dr. Ruthven's opinion on the content and relevance of the air drying prior art.  *See Habecker v. Copperloy Corp.*, 893 F.2d 49, 53 (3d Cir. 1990) ("[H]aving two expert witnesses testify, instead of one, could easily have made the jury more likely to believe [the propounding party's] theory.").[14]  Indeed, on what is clearly one of the most hotly

---

[14]     Furthermore, the exclusion of Dr. Ruthven's testimony on obviousness forced Smiths to lengthen Dr. Denton's testimony on the eve of trial.  The district court's contention that the jury could have afforded less weight to Dr. Denton because of his "lengthy responses" further shows that Smiths was prejudiced from

contested issues, Dr. Ruthven would have testified that "[t]here is no basis whatsoever for asserting that a person of ordinary skill in the art interested in researching dry air sources would not consider [Seibert] pertinent prior art," and "[i]ndeed, it is directly relevant prior art." A11435(¶ 17).

In sum, the district court's error warrants a new trial on the subject matter covered by the excluded testimony—namely infringement and invalidity. *Star Scientific*, 665 F.3d at 1372-73.

## IV. CLAIMS 20, 21, AND 23 OF THE '670 PATENT ARE NOT INFRINGED AS A MATTER OF LAW

### A. Because Morpho Failed to Establish that the IonScan 500DT Allows for Continuous Operation of the *Detector*, No Reasonable Jury Could Find Infringement of Claims 20, 21, and 23.

Claim 20 of the '670 patent requires "continuously operating a *detector*." A1303(claim 20).[15] The parties did not seek to construe these words and thus the jury was instructed to apply their common meaning. A1068(924:21-23).[16] It

---

the improper exclusion of Dr. Ruthven's testimony. A26. Any criticism of Dr. Denton only underscores the prejudice caused by the exclusion of Dr. Ruthven.

[15] The parties agreed that the preamble of claim 20 is a limitation of the claim. A1069-A1070(925:25-926:2).

[16] Morpho did not seek a construction of this term before or during trial and has thus waived its right to seek any construction. *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) ("[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial.").

cannot realistically be disputed that the common meaning of these words is that the operation of the *detector* does not stop.  Nevertheless, Morpho's theory for how this limitation is met in the IonScan 500DT is that because the *dryers* operate continuously, so too does the *detector*.  A501(357:10-21); A539-A540(395:24-396:9).  This argument is a logical fallacy.  Proof that the dryers operate continuously only means that they do not *prevent* continuous operation of the detector, it does not mean that the detector actually operates continuously because there could be *other* impediments to continuous operation.  Morpho submitted no evidence to show that the *detector* operates continuously.

Rather, the evidence supports only a finding of noninfringement, because the IonScan 500DT's detectors are *not* capable of continuous operation.  Dr. Bell admitted that continuous operation requires having at least a 90 percent uptime requirement.  A526-A527(382:19-383:1).  However, the IonScan 500DT is not capable of meeting this uptime requirement, and does not operate continuously because the IonScan 500DT is designed to require at least three and half hours of downtime each day in order to perform a bake-out (i.e., over 14% downtime per day).  A13442; A527-A528(383:14-384:9); A733-A735(589:7-591:16).  Further, the IonScan 500DT uses a batch sampling process which can only be sampling for a maximum of 40% of the time.  A13325; A12259; A12274; A528-A529(384:18-385:4); A731-A733(587:19-589:6).  This batch sampling process is fundamentally

different than a "continuous" sampling process, which detects samples literally every second of the day.[17] Quite simply, because the *detectors* in the IonScan 500DT *stop detecting* throughout the day, they are not capable of continuous operation. Thus, the jury's finding of infringement of claims 20, 21, and 23 should be rejected as a matter of law. *Brooke Group*, 509 U.S. at 242; *Rohm and Haas*, 127 F.3d at 1092; *Johns Hopkins*, 543 F.3d at 1348.

The district court correctly found that "the trial evidence demonstrated that Smiths recommended that its customers perform *daily* 'bake outs' of the IMS detector (a *several hour* self-cleaning process) and that customers replace the desiccant towers every year. Accordingly, Smiths' own IMS detector product *does not appear to be specifically designed to achieve 24/7 operation*, nor does it appear to be aimed at incorporating a drying system that uses non-consumable permanent desiccant." A45(n.17) (certain emphasis added, certain emphasis removed). In light of this finding, the district court should have granted JMOL of no infringement of claims 20, 21, and 23. The district court provided no explanation for why it did not do so. A61.

---

[17]    Detection systems that sample every second of the day are not uncommon. For example, Smiths manufactures a "Centurion" line of products that continuously monitor the air inside a building for the presence of toxic chemicals. A687(543:6-25); A690-A691(546:14-547:11). Similarly, U.S. Patent No. 4,983,190 discloses a system for detecting whether air inside a chemical weapons shelter has become unbreathable due to the presence of toxic vapors. A11987(1:7-14); A11988(3:32-38); A11991(10:3-18).

**B.** **Because Morpho Failed to Prove that Each Step of the Method Claims has been Performed in the United States in the Damages Period, No Reasonable Jury Could Find Infringement of Claims 20, 21, and 23.**

As discussed above, claim 20 requires "continuously operating a detector." Morpho offered no evidence of how purchasers of the accused 500DT operate it in practice. The evidence did establish that Smiths instructs users not to operate it continuously, as set forth above. Given the utter lack of evidence that anyone in the United States used the 500DT in the claimed manner, the jury's finding that each step of claims 20, 21 and 23 has been performed by Smiths or anyone else in the United States after September 2, 2011[18] should be rejected as a matter of law. *See Mirror Worlds*, 692 F.3d at 1360; *Meyer Intellectual Props.*, 690 F.3d at 1369-71; 35 U.S.C. § 287(a).

**C.** **No Reasonable Jury Could Find that Smiths had the Necessary Intent for Induced or Contributory Infringement.**

Morpho has put forth no evidence that demonstrates that Smiths had the requisite mental state required for liability under either 35 U.S.C. § 271(b) or § 271(c). With respect to inducement under § 271(b), the patentee must demonstrate that the accused infringer actually intended to cause infringing acts by end users, or remained willfully blind to the infringement. *Global-Tech Appliances, Inc. v. SEB*

---

[18] The district court granted summary judgment of laches and failure to mark. A10031-A10065.

*S.A.*, 131 S. Ct. 2060, 2068-69 (2011).  Morpho has completely failed to offer any evidence of Smiths' mental state with respect to its customers' use of the 500DT.

Furthermore, in granting summary judgment of no willfulness, the district court found that "there is *no question* that Smiths formed a reasonable, *good faith*, and potentially meritorious argument of invalidity after Smiths became aware of the '670 patent."  A10064.  This Court recently held that "evidence of an accused inducer's good-faith belief of invalidity may negate the requisite intent for induced infringement."  *Commil*, 720 F.3d 1361, 1368 (Fed. Cir. 2013).  Accordingly, the district court's finding further demonstrates that the jury's finding of induced infringement lacks substantial evidence.  *Id.*

With respect to contributory infringement under § 271(c), the jury has been presented with no evidence whatsoever that Smiths knew the IonScan 500DT was "especially made or especially adapted for use in an infringement" of the '670 patent, or that it was not conducive to substantial non-infringing use.  Moreover, with respect to claims 20, 21 and 23, even if Morpho had attempted to prove this mental state (which it did not), it would be impossible to do so, because Smiths recommends that users shut down the IonScan 500DT each day for at least three and half hours to perform a daily bake-out, which means that the IonScan 500DT is not only capable of substantial non-infringing use of claims 20, 21 and 23, but its everyday intended use is non-infringing.  A13442; A527-A528(383:14-384:9);

A733-A735(589:7-591:16).  With the complete absence of evidence regarding Smiths' knowledge and intent, no reasonable jury could find that Smiths intentionally induced its customers to infringe or knew that it was contributing to their infringement.  Further, no reasonable jury could find that the 500DT did not have a substantially non-infringing use with respect to claims 20, 21, and 23.

## V.    CONCLUSION

For these reasons Smiths respectfully requests that the Court reverse the district court's ruling on Smiths' motion for JMOL and hold that the Asserted Claims are obvious and that claims 20, 21, and 23 are not infringed as a matter of law.  In the alternative, Smiths respectfully requests that this Court remand for a new trial on infringement and invalidity with the testimony of Drs. Harrington and Ruthven being allowed and the jury instructed that Seibert is analogous prior art.


Respectfully submitted,


Dated:  February 3, 2014          */s/ Zaed M. Billah*
                                  JOHN R. HUTCHINS
                                  KENYON & KENYON LLP
                                  1500 K Street, NW
                                  Washington, DC 20005
                                  (202) 220-4200

                                  ZAED M. BILLAH
                                  KENYON & KENYON LLP
                                  One Broadway
                                  New York, NY 10004

(212) 425-7200

*Counsel for Defendant-Appellant*
*Smiths Detection Inc.*

CASE PARTICIPANTS ONLY    Document: 21    Page: 76    Filed: 02/03/2014

# ADDENDUM

# TABLE OF CONTENTS

| Description | Pages |
|---|---|
| Final Judgment  (Dec. 19, 2012) | A1 |
| Order Issuing Final Judgment (Dec. 19, 2012) | A11-A13 |
| Opinion and Order Denying Motion for JMOL and Motion for a New Trial (July 11, 2013) | A14-A67 |
| Order regarding Motions *in Limine* to Exclude Testimony of Dr. Harrington and Dr. Ruthven (Nov. 30, 2012) | A68-A74 |
| U.S. Patent No. 6,815,670 | A1293-A1303 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

DEC 19 2012

CLERK US DISTRICT COURT
NORFOLK , VA

MORPHO DETECTION, INC.,

     Plaintiff,

**JUDGMENT IN A CIVIL CASE**

v.                    CASE NUMBER:   2:11cv498

SMITHS DETECTION, INC.,

     Defendant.

[X] **Jury Verdict.** This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

[X] **Decision by Court.** This action came for determination before the Court as to the issue of obviousness.  This issue has been considered and a decision has been rendered.

    **IT IS ORDERED AND ADJUDGED** that the plaintiff is awarded lost profit damages in the amount of One Million Six Hundred Thousand and 00/100 Dollars ($1.6 Million), and reasonable royalty damages in the amount of Three Hundred Sixty Thousand and 00/100 Dollars ($360,000).

Date:   December 11, 2012        FERNANDO GALINDO, CLERK

By:       /s/ Vaw
          Valerie A. Ward
          Deputy Clerk

Form of judgment approved in accordance with Rule 58, FRCP, December 19 , 2012

        /s/ MSD
Mark S. Davis
United States District Judge

**A0000001**



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

MORPHO DETECTION, INC.,

        Plaintiff,

v.                           CIVIL ACTION NO. 2:11cv498

SMITHS DETECTION, INC.,

        Defendant.

<u>ORDER</u>

    At the conclusion of a week-long jury trial, the civil jury empaneled in this case reached a unanimous verdict finding that defendant Smiths Detection, Inc. ("Smiths"), infringed on all of the asserted claims of U.S. Patent No. 6,815,670 (the "'670 patent"), which is owned by plaintiff Morpho Detection, Inc. ("Morpho"). Currently outstanding are two pre-verdict Rule 50(a) motions for judgment as a matter of law filed by Smiths and one Rule 50(a) motion filed by Morpho.

    In addition to the above referenced jury verdict, the jury made factual findings relevant to the legal determination of obviousness. The jury also issued an advisory finding on the ultimate issue of obviousness as to the asserted claims of the '670 patent. See <u>Wyers v. Master Lock Co.</u>, 616 F.3d 1231, 1237 (Fed. Cir. 2010) (indicating that "[o]bviousness is a question

A0000011

of law based on underlying findings of fact"); KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 427 (2007) ("The ultimate judgment of obviousness is a legal determination"). Such advisory finding held that Smiths failed to demonstrate, by clear and convincing evidence, that any of the asserted claims of the '670 patent are invalid as obvious. In support of such conclusion, the jury made the following factual findings: (1) the primary "dryer" prior art reference relied on by Smiths, patent number 3,513,631 (the "'631 patent"), is not "analogous" prior art; (2) the combination of the '631 patent and a prior art patent that is indisputably analogous prior art, patent number 5,405,781 (the "'781 patent"), did not teach each and every limitation in the claims at issue; (3) there was not a motivation to combine the '631 patent and '781 patent; and (4) Morpho proved the existence of all five of the secondary considerations of non-obviousness at issue. See In re Mouttet, 686 F.3d 1322, 1330 (Fed. Cir. 2012) ("The scope and content of the prior art, as well as whether the prior art teaches away from the claimed invention, are determinations of fact.").

As a result of such factual findings, the legal determination of "obviousness" cannot be said to be a close question. The jury found that Smiths failed to make a prima facie case of obviousness and further resolved all of the disputed secondary considerations of non-obviousness in Morpho's

2

favor. It is therefore not debatable that the facts <u>as found by the jury</u> militate in favor of a ruling for Morpho on this legal issue. <u>See</u> Smiths' Mo. ECF No. 313, at 4 ("The Court should determine obviousness <u>using the facts found by the jury</u>.") (emphasis added). Accordingly, the Court **FINDS** that Smiths failed to demonstrate, by clear and convincing evidence, that Claims 12, 13, 14, 17, 20, 21, and 23 of Morpho's '670 patent would have been obvious to a person of ordinary skill in the art at the time the '670 patent application was filed.

In addition to the above finding, the Court **DENIES** the parties' previously filed Rule 50(a) motions. ECF Nos. 335, 346, and 348. To the extent either party seeks to renew portions of their prior arguments and/or challenge whether the jury's factual findings are supported by substantial evidence, the Court will address such matters in resolving any timely filed Rule 50(b) motions.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record. The Clerk is further **INSTRUCTED** to enter Judgment in favor of Morpho.

It is so **ORDERED**.

/s/ _____

Mark S. Davis
United States District Judge

Norfolk, Virginia
December 18 , 2012

3

A0000013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

MORPHO DETECTION, INC.,

        Plaintiff,

v.                            CIVIL ACTION NO. 2:11cv498

SMITHS DETECTION, INC.,

        Defendant.


## OPINION AND ORDER

Currently pending before the Court are Defendant Smiths
Detection, Inc.'s ("Smiths") Rule 50(b) motion for judgment as a
matter of law and Rule 59(a) motion for a new trial.[1] At the
conclusion of a week-long jury trial, the civil jury empaneled
in this case reached a unanimous verdict, concluding that: (1)
defendant Smiths infringed on all asserted claims of U.S. Patent
No. 6,815,670 (the "'670 patent"), which is owned by plaintiff
Morpho Detection, Inc. ("Morpho"); and (2) that Morpho's '670
patent was neither anticipated nor rendered obvious by prior
art. For the reasons discussed below, Smiths' post-trial
motions are **DENIED**.

---

[1] Also pending before the Court is plaintiff Morpho Detection, Inc.'s
motion seeking interest and damages for ongoing infringement.
Plaintiff's motion will be addressed by the Court in a separate Order.

## I. Background

### A. The Disputed Technology

Morpho's '670 patent is titled "Materials and Apparatus for the Detection of Contraband." The claims of such patent are directed toward a detector apparatus, and method, used to identify trace amounts of contraband. The patent, by its express terms, covers detector devices such as Ion Mobility Spectrometers ("IMS"), which are found in the prior art. Commercialized embodiments of such prior art detectors are used at airports and other security screening areas to detect trace amounts of explosives or narcotics residue. IMS contraband detectors require a flow of clean dry air to operate, and the asserted advancement appearing in the claims of the '670 patent is a detector apparatus that utilizes (at least) two alternating dryers to provide the flow of clean dry air to the detector. While one dryer is operating to provide the necessary dry air flow to the detector, the other dryer is in regeneration mode. This alternating use/regeneration permits the water absorbing desiccant inside each dryer to be regenerated without requiring the detector device to be taken off line. Furthermore, unlike the prior IMS detector devices commercialized by both Smiths and Morpho, the desiccant in the dryers does not require frequent replacement, which among other things, reduces the costs of operation.

2

A0000015

## B. Trial and Verdict

At the conclusion of a six-day jury trial, the jury returned a verdict in favor of Morpho. The completed verdict form returned by the jury first indicated that Smiths directly infringed, and contributed to or induced others to infringe, on multiple claims of the '670 patent. On question three of the verdict form, the jury concluded that Smiths failed to prove by clear and convincing evidence that Claim 20 of the '670 patent was "anticipated" by the identified prior art reference. On question four, the jury concluded that Smiths failed to prove by clear and convincing evidence that U.S. Patent No. 3,513,631 (the "'631 patent"), a "gas fractionator" patent from 1970, was "analogous" prior art. On question five, the jury concluded that Smiths failed to prove by clear and convincing evidence that a combination of the '631 gas fractionator patent with U.S. Patent No. 5,405,781 (the "'781 patent"), an IMS detector patent owned by Smiths, possessed each and every limitation in the disputed claims of the '670 patent. On question six, the jury concluded that Smiths failed to prove by clear and convincing evidence that there was a motivation for one of ordinary skill in the art to combine the '631 gas fractionator patent and the '781 IMS detector patent. On question seven, the jury concluded that Morpho proved, by a preponderance of the evidence, all five of the "secondary considerations of nonobviousness" that are

3

A0000016

listed on the verdict form. On question eight, the jury made the (advisory) conclusion that, based on the facts found in questions four through seven, Smiths failed to prove by clear and convincing evidence that any of the disputed claims would have been obvious to a person of ordinary skill in the art. The remaining questions on the verdict form involve damages, with the jury awarding Morpho approximately 2 million dollars total, 1.6 million of which were designated as "lost profits." Verdict Form, ECF No. 360.

Subsequent to the entry of the jury verdict, the Court made its own legal determination of "obviousness" based on the jury's factual findings on questions four through seven. The Court's finding was the same as the jury's advisory finding: that Smiths failed to prove by clear and convincing evidence that any of the disputed claims were invalid based on obviousness. ECF No. 364.

## II. Rule 50(b) Motion for Judgment as a Matter of Law

### A. Rule 50(b) Standard[2]

In a patent case, the law of the regional circuit governs a motion for judgment as a matter of law (JMOL) under Rule 50(b). See SynQor, Inc. v. Artesyn Techs., 709 F.3d 1365, 1373 (Fed. Cir. 2013) ("This court reviews the grant or denial of a motion

---

[2] Rule 50(b) governs the filing of a renewed motion for judgment as a matter of law and requires that the party advancing such a motion had previously raised the same arguments, during trial, in a Rule 50(a) motion for judgment as a matter of law. Fed. R. Civ. P. 50(a)-(b). Here, it is undisputed that Smiths properly filed the required Rule 50(a) motion during trial.

4

for JMOL under the law of the regional circuit . . . ."). As explained by the Fourth Circuit:

> A trial court may grant judgment as a matter of law when it finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-moving party. A court, however, may not disturb the verdict where there was sufficient evidence for a reasonable jury to find in the non-movant's favor. A trial court may not appropriately enter [JMOL] unless it concludes, after consideration of the record as a whole in the light most favorable to the non-movant, that the evidence presented supports only one reasonable verdict, in favor of the moving party.

Dotson v. Pfizer, Inc., 558 F.3d 284, 292 (4th Cir. 2009) (internal quotation marks and citations omitted) (alteration in original); see Price v. City of Charlotte, N.C., 93 F.3d 1241, 1249 (4th Cir. 1996) ("Because federal courts do not directly review jury verdicts, constrained, as we are, by the Seventh Amendment, the [proponent of a JMOL motion] bears a hefty burden in establishing that the evidence is not sufficient to support the [jury's findings]."); cf. Tights, Inc. v. Acme-McCrary Corp., 541 F.2d 1047, 1055-56 (1976) (indicating in a patent case decided before the creation of the Federal Circuit that "the rules governing appellate review of patent cases," including the rules governing a motion for a directed verdict, are "no different than in other types of civil litigation").

5

## B. Obviousness Discussion – Rule 50(b) motion

### 1. Obviousness Standard

A patent is invalid based on obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). While the obviousness inquiry is ultimately a legal determination, it is predicated on underlying factual findings that are unique to each patent case. KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406-07 (2007). The following four factual findings guide the obviousness inquiry: "(1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." Wyers v. Master Lock Co., 616 F.3d 1231, 1237 (Fed. Cir. 2010) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)) (hereinafter "the Graham factors").

Because a patent enjoys a statutory presumption of validity, 35 U.S.C. § 282, an alleged infringer seeking to establish that a patent is invalid as obvious must overcome the presumption of validity "by clear and convincing evidence,"

6

*Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1320 (Fed. Cir. 2011); *see Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2250-51 (2011) (indicating that although the Patent and Trademark Office's ("PTO") failure to consider a specific prior art reference is relevant to the obviousness determination, there is always a presumption of validity that can only be overcome by clear and convincing evidence). Accordingly, to prove obviousness, an alleged infringer must establish, by clear and convincing evidence, that a skilled artisan would have both been motivated to combine the prior art and have a reasonable expectation of success in doing so. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012).[3] Generally, a district court, and not the jury, should make the ultimate legal conclusion as to whether an alleged infringer has proven that a disputed claim is obvious, and the court "must consider all of the *Graham* factors prior to reaching a conclusion with respect to obviousness." *Id.* (emphasis added).

An inquiry into the first three *Graham* factors governs whether an alleged infringer has demonstrated a "prima facie case" of obviousness. *Transocean Offshore Deepwater Drilling,*

---

[3] While it remains useful to consider any "teaching, suggestion, or motivation to combine elements from different prior art references," the Supreme Court's opinion in *KSR* made clear that the overall obviousness inquiry "must be expansive and flexible." *Kinetic Concepts*, 688 F.3d at 1360.

A0000020

Inc. v. Maersk Contractors USA, Inc., 617 F.3d 1296, 1305 (Fed. Cir. 2010). "The establishment of a prima facie case, however, is not a conclusion on the ultimate issue of obviousness." Id. Rather, by definition a prima facie case means that such showing creates a presumption subject to being "disproved or rebutted," and a patent holder is therefore "free to introduce evidence relevant to the fourth Graham factor, objective evidence of nonobviousness, which may be sufficient to disprove or rebut a prima facie case of obviousness." Id. (internal citations omitted).

Here, the parties stipulated to the definition of a person of "ordinary skill in the art," and the third Graham factor is therefore not in dispute.[4] As discussed below, the jury reasonably found in favor of Morpho as to the remaining three Graham factors. Because the jury's factual findings remain undisturbed, this Court's legal conclusion regarding obviousness likewise remains unchanged. Alternatively, even if Smiths' Rule 50(b) motion was meritorious as to the first two Graham factors, the Court would still resolve the ultimate legal question of obviousness in favor of Morpho based on Morpho's strong showing on the fourth Graham factor-the secondary considerations of

---

[4] The parties stipulated that a person of "ordinary skill in the art" would have "at least a B.S. in mechanical engineering, chemical engineering, physics, or chemistry (or equivalent experience), and at least three years of work experience in designing pneumatics and gas purification systems for analytical instruments."

8

A0000021

nonobviousness (also referred to as the "objective indicia of nonobviousness").

## 2. Scope of the Prior Art

Smiths' Rule 50(b) motion first argues that the jury's verdict was unreasonable with respect to the factual finding that Smiths did not prove, by clear and convincing evidence, that the '631 gas fractionator patent was "analogous" prior art. See Verdict Form Question 4, ECF No. 360.[5] Prior art is considered "analogous" if the prior patent "is from the same field of endeavor [as the patent in suit] regardless of the problem addressed," or if falling outside of the inventor's field of endeavor, the prior patent "still is reasonably pertinent to the particular problem with which the inventor is involved." Wyers v. Master Lock Co., 616 F.3d 1231, 1237 (Fed. Cir. 2010). As the jury instructions stated in this case, "a prior art reference is reasonably pertinent to the inventor's problem if it is one which, because of the matter in which it deals, logically would have commended itself to an inventor's attention in considering his or her problem." Jury Instr. 20 (emphasis added). Although a very close question, in light of the "clear and convincing evidence" standard, the Court cannot

---

[5] Although numbered differently, the requirement that Smiths prove by clear and convincing evidence that a prior art reference is "analogous" was included by Smiths on its original proposed verdict form. Proposed Verdict Form Question 6, ECF No. 318. The verdict form presented to the jury included the same language. Verdict Form Question 4, ECF No. 360.

A0000022

find that it was "unreasonable" for the jury to conclude that Smiths failed to carry its burden to demonstrate that the '631 gas fractionator patent is "analogous" prior art.[6]

a.

First, the evidence Smiths presented to the jury on this issue was primarily the '631 patent itself and the testimony of Smiths' expert, Dr. Bonner Denton. Although Dr. Denton reviewed portions of the '631 patent with the jury and offered his conclusion that such patent was analogous prior art, in light of its obligation to consider how the jury might have judged credibility and evidentiary weight, the Court feels constrained to note that Dr. Denton's demeanor on the stand was excitable, for lack of a better word.[7] Additionally, Dr. Denton had a tendency to veer off course and provide long-winded testimony about matters other than the question directed to him, which,

---

[6] Based on the trial evidence, if the Court was the finder of fact, the Court would have concluded that the '631 patent is analogous art to Morpho's '670 patent as it appears to be "reasonably pertinent" to the problem solved by Morpho's '670 patent. However, it is impermissible for the Court to substitute its interpretation of the facts for the jury's, as long as the jury's factual finding is "reasonable." See United States v. Kivanc, 714 F.3d 782, 795 (4th Cir. 2013) (indicating that, when resolving a Rule 50 motion, the Court "may not make credibility determinations or substitute [its] judgment for that of the jury").

[7] Dr. Denton testified that he had a "machine shop" at his home where he both builds IMS detectors and other scientific devices and pursues his hobby of building race cars. Trial Tr. 685, ECF No. 355. He further testified that he was clocked going over 310 miles per hour in a race car in "the flying mile." Id. Dr. Denton then noted that his race car hobby reveals that he is "a little bit crazy occasionally" but he tries "never to be stupid." Id.

10

A0000023

similar to his demeanor, could have impacted <u>the weight</u> the jury gave to his testimony. <u>See</u> Trial Tr. 725, ECF No. 355 (discussion at a bench conference where Morpho's counsel complained that Dr. Denton was speaking for five to eight minutes in response to a single question to which the Court: (1) noted that it had previously commented on such problem; (2) opined that Smiths was getting the testimony it wanted but not "the way [Smiths] need[ed] it for [its] case"; and (3) warned Smiths that it was "going to lose the jury on the whole issue"). The Court does not suggest that Dr. Denton lacked credibility or that the jury was free to wholly disregard his largely unrebutted opinion on this issue. <u>See</u> <u>Chesapeake & O. Ry. Co.</u> <u>v. Martin</u>, 283 U.S. 209, 216 (1931) (recognizing that although "the question of the credibility of witnesses is one for the jury alone" such rule "does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt"). However, in this Court's view, the fervid character of Dr. Denton's testimony, as well as his lengthy responses, remain relevant to the jury's determination as to <u>the weight</u> to give such testimony. Notably, as explained by the Federal Circuit:

> Beyond credibility, the weight given to particular testimony by the jury can be affected by the demeanor and responsiveness of a witness during direct

11

A0000024

testimony and upon cross-examination. These concerns
are equally applicable to trials of patent issues as
to any other. For instance, testifying corporate
executives may be biased by a financial interest.
Expert witnesses, frequently necessary to explain
terminology or the general teachings of the art, may
also be similarly biased. Courts have commented on
the inherent discredit that may be placed upon an
inventor's testimony, especially when relating to the
teachings of the prior art or to the inventor's
recollection of the act of invention. These
considerations focus on the weight to be given to
testimonial evidence and go beyond an assessment of
adherence to truth. Thus, a juror's adverse appraisal
of particular testimony need not rise to the level of
general credibility.

_Biodex Corp. v. Loredan Biomedical, Inc._, 946 F.2d 850,
860 (Fed. Cir. 1991) (internal citations omitted); _see also_
_United States v. Acosta_, 369 F.2d 41, 43 (4th Cir. 1966) (noting
that it was for the factfinder, who in that criminal case was
the trial judge, to "weigh [the expert's] testimony in light of
the witness' demeanor and the total impact of his testimony" in
determining whether the government satisfied its _elevated burden_
_of proof_). Accordingly, it was permissible for the jury to
consider the manner in which Dr. Denton testified when
determining the persuasiveness of his opinion and weighing
whether such testimony was sufficient to prove _by clear and_
_convincing evidence_ that the '631 gas fractionator patent
logically would have commended itself to a person of ordinary

12

A0000025

skill in the art working on the problem addressed by Morpho's IMS detector patent.[8]

### b.

In addition to Dr. Denton's demeanor and lengthy responses to directed questions, it is notable that Dr. Denton was portrayed by Smiths as a type of "super-expert." The jury could have acted reasonably in considering such portrayal when determining whether Smiths carried its burden to prove whether the '631 patent would have logically commended itself to a person of ordinary skill in the art. Specifically, Smiths explained during its opening statement that Dr. Denton was the only person that the jury would hear from that could build an IMS detector from scratch, and that Dr. Denton had forgotten more about IMS detectors than all the other witnesses combined probably knew. Trial Tr. 120, ECF No. 358. Dr. Denton's testimony further supported such characterization, as he testified that he has a "machine shop" at his home where he designs and builds IMS detectors and that he personally builds much of the equipment needed at the various research laboratories where he works. Trial Tr. 684-85, ECF No. 355.

---

[8] The Court does not highlight these matters in an effort to cast aspersions of any kind on Dr. Denton or his truthfulness. However, such considerations are "not always adequately reproduced in a transcript" and thus, "are not accessible to the appellate court unless attention is directed to them by the district court or the appellee." Biodex Corp., 946 F.2d at 859-60.

13

Although the parties stipulated that a person of "ordinary skill in the art" would have "at least a B.S. in mechanical engineering, chemical engineering, physics, or chemistry (or equivalent experience), and at least three years of work experience in designing pneumatics and gas purification systems for analytical instruments," Dr. Denton, has both a B.S. and Ph.D in chemistry and has "well over 40 years" of experience designing pneumatics and gas purification systems for analytical instruments. Id. at 680, 684-85 (emphasis added). It therefore would have been reasonable for the jury to consider the characterization of Dr. Denton as an expert with almost unparalleled expertise when determining whether Smiths had proven by clear and convincing evidence that the '631 patent would have "logically commended itself" to a person of ordinary skill in the art who was addressing the consumable desiccant problem in IMS detectors.

In line with the discussion immediately above, an examination of Dr. Denton's trial testimony on the '631 patent reveals that, even though he is a college professor of chemistry and biochemistry, he did not explain what is taught to college students about desiccant dryer technology in a B.S. program in mechanical engineering, chemical engineering, physics, or chemistry. Likewise, he did not explain what an individual would learn during his or her first three years of work

14

experience in designing pneumatics and gas purification systems. Accordingly, it appears that the jury was left with limited direction as to how a person of "ordinary skill" in the art might view the '631 patent vis-à-vis the problem in the IMS detector art that Morpho's patent was directed at solving.

c.

Third, as discussed in greater detail in the "motivation to combine" analysis below, it appears that Dr. Denton's testimony improperly relied on hindsight when discussing "the problem" solved by Morpho's '670 patent and how the '631 patent was purportedly "reasonably pertinent" to such problem. Trial Tr. 733-34, ECF No. 355. Dr. Denton's testimony indicated that one skilled in the art seeking to design an IMS detector with a dryer capable of continuous operation would have looked to the '631 patent. Id. However, the problem as it existed in the field before Morpho's '670 patent was the short life span and high cost of consumable desiccant in IMS detectors, not finding a solution to an industry need for an IMS detector dryer capable of "continuous use." As explained by the Federal Circuit, when determining whether a prior art reference from outside the field is "relevant" to the problem the invention solves, "[d]efining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness."

15

A0000028

<u>Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH</u>, 139 F.3d 877, 881 (Fed. Cir. 1998) (emphasis added).

Considering the "problem" solved by the '670 <u>without the benefit of hindsight</u>, and comparing that to the problem addressed by the '670 patent, reveals that this issue is not as clear-cut as suggested by Dr. Denton.    The trial evidence suggested that the "problem" solved by Morpho's '670 patent is best characterized as increasing the life of the consumable desiccant in an IMS detector device <u>designed for use in the field</u> in a manner that does not sacrifice the sensitivity of the IMS detector or import other negative characteristics into the detector device that consumers would view as undesirable (e.g., substantially increased cost, substantial increased size, etc.). According to the specification of the '631 gas fractionator patent, the "problem" solved by such patent appears to be increasing the efficiency of a heat reactivated dual-bed gas fractionator by avoiding the unnecessary application of excess heat, which is both wasteful and has a negative effect on the efficiency of the adsorption process.    '631 2:5-30.    Because such patents are in different fields, and address somewhat different problems, and because Morpho's cross examination of Dr. Denton and closing argument warned against the improper reliance on hindsight, it would have been reasonable for the jury to discount Dr. Denton's improper hindsight analysis when

16

determining if Smiths proved, by clear and convincing evidence, that the '631 patent would have "logically commended itself" to the ordinary skilled artisan in October of 1998. Cf. In re Clay, 966 F.2d 656, 659 (Fed. Cir. 1992) (indicating that "[i]f a reference disclosure has the same purpose as the claimed invention, the reference relates to the same problem, and that fact supports use of that reference in an obviousness rejection . . . [however,] [i]f it is directed to a different purpose, the inventor would accordingly have had less motivation or occasion to consider it") (emphasis added).

### d.

Fourth, the jury heard testimony from Anthony Jenkins, the lead inventor of Morpho's '670 patent, who testified (through video deposition) about drafting the '670 patent application and the state of the relevant art at the time. Mr. Jenkins indicated that, at the time he was developing the '670 patent, he had general knowledge of regenerative drying and knew about regenerative "pressure swing dryers."[9] Jenkins Video Depo.

---

[9] The Court largely rejects the arguments advanced by Morpho, in its brief in opposition to Smiths' Rule 50(b) motion, that appear to improperly characterize the '631 gas fractionator patent as either being limited to a "pressure swing dryer" or being limited to a large-scale dryer such as the exemplary large-scale dryer discussed in the specification of the '631 patent. The specification to the '631 patent explains why using pressure to assist in regeneration is preferred, but expressly recognizes that it is not necessary and that heat alone can be used. '631 7:65-70. Furthermore, the '631 patent states that the claimed invention is scalable and could be used to generate small flows of compressed air suitable for instruments. '631

17

**A0000030**

78:24-79:25. Mr. Jenkins did not, however, review any literature or patents covering pressure swing dryers at the time he was developing his invention because he did not believe them to be relevant. Id. at 81:14-82:06, 88:07-88:14. Furthermore, Mr. Jenkins testified that IMS detectors have special and very exacting requirements for the flow of dry air and that "there was no known automatic drying system to [him] certainly at that time that would meet all . . . [of the] exacting requirements for IMS operation." Id. at 79:09-79:15.

Although Mr. Jenkins' testimony is plainly self-serving and typically might be afforded very minimal weight, Biodex Corp., 946 F.2d at 860, such testimony cannot be disregarded in this case due to the trial evidence that lends support for Mr. Jenkins' statements. Most tellingly, Dr. Sabatino Nascom, Smiths' own scientist, whose skill in the art was not challenged, testified both about pressure swing dryers and the IMS dryer solutions available during the 1990s. Dr. Nascom

---

8:30-36, 9:15-17. That said, it is notable that testimony from Smiths' own scientist, Dr. Sabatino Nascom, suggests that during initial development of Smiths' regenerative drying system for its commercial IMS detector, Smiths' scientists were unsure if a dual-tower regenerative drying system was: (1) capable of producing the required quality of air necessary for an IMS detector; and (2) capable of maintaining such exacting air quality if miniaturized to the size necessary to fit inside a commercial IMS detector. Nascom Video Depo. 44:06-45:03. Accordingly, although the '631 patent states on its face that it is "scalable," such fact alone does not prove that one of ordinary skill in the art relevant to IMS detection would view such patent as a "solution" to the consumable desiccant problem in IMS detectors.

18

talked about his experience testing pressure swing dryers for
use with an IMS detector and indicated that such testing
revealed that using a pressure swing dryer was not effective and
did not deliver a high enough quality of air. Nascom Video
Depo. 40:04-41:04. Furthermore, Dr. Nascom indicated that
Smiths' customers had complained about the ongoing cost of the
consumable desiccant necessary to operate Smiths' "400A" product
(which was sold during the 1990s), but that "there was no other
solution at the time." Id. at 17:15-17:21, (emphasis added).
Morpho repeatedly highlighted this latter statement to the jury
during its closing argument, and it was reasonable for the jury
to credit such statement made by Smiths' own scientist/employee
about the unavailability of other IMS detector desiccant dryer
"solutions" during the 1990s. It is also notable that the trial
evidence suggested that Smiths scientists did not independently
identify the '631 patent as a relevant solution to the IMS
consumable desiccant problem despite trying for years to improve
on IMS detector dryer technology.[10]

---

[10] The jury did hear testimony indicating that Smiths' scientists had
identified regenerative drying as a possible solution to the IMS
consumable desiccant problem, but that management of the company did
not like the idea because it would cut into the profits Smiths earned
from selling desiccant to its customers. However, it appears from the
jury's verdict that the jury did not place much weight on such
testimony. Such interpretation of the evidence was reasonable in
light of the lack of any documentary evidence suggesting that Smiths'
scientists explored regenerative drying as a solution as well as
Smiths' internal company documents suggesting the converse—that Smiths
both struggled to identify regenerative drying as a viable solution

19

**A0000032**

In addition to Mr. Jenkins' and Dr. Nascom's testimony, the jury heard evidence that <u>more than two decades after</u> the '631 patent was issued, Smiths' solution to the exact same IMS detector consumable desiccant problem that is addressed by Morpho's '670 patent was to add a "chiller" to remove the bulk of the water from an air sample before that sample passed through a single desiccant dryer. Smiths not only came up with this apparently inventive concept in 1993, but received a patent on such concept. <u>See</u> '781 patent. According to the specification of Smiths' '781 patent, the addition of a chiller located upstream from the desiccant dryer was aimed at extending the life of the desiccant up to ten times longer than the prior art IMS detector systems that did not incorporate a chiller. '781 6:46-49. Such patented drying system, unlike Morpho's '670 patent, did not incorporate an internal alternating dual regenerative dryer with the ability to both regenerate while the detector was still in operation and meet the air quality standards necessary for effective IMS detection.[11] Smiths' 1993

for use with an IMS detector and later struggled to design a regenerative dryer suitable for use with an IMS detector even after such solution was identified.

[11] Although Smiths' '781 patent recognized the possibility that the desiccant dryer inside the IMS detector device could be "regenerated," the IMS detector apparatus covered by Smiths' 1993 patent only had <u>one desiccant dryer</u>, and therefore, the desiccant could only be regenerated while the detector was off-line. Stated differently, although Smiths' '781 patent incorporated two different dryers and acknowledged that the desiccant in the second dryer needed to either

20

A0000033

dryer "solution" was never commercialized and appears far less effective than Morpho's 1998 solution. Such fact is notable because Smiths portrayed itself to the jury as a company that has been in the detector industry "for decades" and is the "gold standard" in IMS and other detector technology. Trial Tr. 118, ECF No. 358. The fact that Smiths is such a major player in the industry with decades of experience bolsters the weight the jury reasonably placed on Smiths' inability to present any company documentation indicating that Smiths <u>even considered</u> regenerative drying as a possibility for use in its IMS detector products at any point prior to discovering that its competitor (Morpho) had successfully made such advancement.

Although the question for the jury is not what Smiths' (or Morpho's) scientists subjectively believed, but is instead focused on the <u>viewpoint of a hypothetical person of ordinary skill in the art</u>, Dr. Nascom's testimony and the facts surrounding Smiths' '781 patent offer some context when analyzing whether a prior patent, issued several decades earlier, would logically commend itself to such a hypothetical artisan. Notably, Dr. Nascom's testimony, suggesting that Smiths' scientists were unsure if a dual-tower regenerative system could be sufficiently miniaturized to fit inside an IMS

be replaced or regenerated, nothing therein suggested the use of "alternating" dryers or the regeneration of desiccant occurring while the detector was still in operation.

21

**A0000034**

detector yet still provide the exacting quality of air necessary for IMS detection, further suggests that the '631 patent would not "logically commend" itself to one skilled in the art. See Nascom Video Depo. 44:06-45:03 (indicating that Smiths' scientists first needed to perform testing to determine if a dual-tower regenerative system was even capable of providing the quality of gas necessary for IMS detection and then needed to see if it was possible to maintain such gas quality with miniaturized desiccant towers as "[t]he size of the towers was very critical because . . . by reducing the size, it would affect the performance").

e.

Fifth, when the trial evidence is viewed in Morpho's favor, as is required on a Rule 50(b) motion, Morpho demonstrated that Smiths' scientists struggled to develop an internal dual-tower alternating regenerative dryer even after they heard that Morpho had designed a regenerating dryer for Morpho's commercialized IMS detector product (the "Itemizer 3"). At trial, Morpho presented several of Smiths' internal documents, including meeting notes and schematics, illustrating Smiths' lengthy process of designing an internal IMS dual tower alternating regenerative dryer. See DTX 19, 100; PTX 118; see also Nascom Video Depo. at 60:15-63:16 (discussing Smiths' early designs aimed at improving its IMS drying system, including reliance on

22

"nafion tubing" and a "condenser," but noting that such drying elements were later rendered unnecessary by the "regenerative dual towers"). Viewing such evidence in the light most favorable to Morpho, it appears that it was not until October of 2004 that Smiths settled on a design for its new IMS drying system, a design that essentially mirrored the design set forth in Morpho's '670 patent. Such date is notable because Smiths purchased an Itemizer 3 in February of 2004, and Morpho's patent appears to have first been published by the PTO in May of 2004.[12] The fact that Smiths' scientists appeared to have difficulty designing a regenerative dryer suitable for use inside an IMS detector device even after Smiths knew that Morpho had succeeded in such endeavor further supports the inference that the '631 patent, which had been issued in 1970, did not "logically commend" itself to an individual of ordinary skill in the relevant art. See Continental Can Co. USA, Inc. v. Monsanto Co., 948 F.2d 1264, 1273 (Fed. Cir. 1991) (although making such statement when analyzing the objective indicia of nonobviousness, recognizing that such objective indicia "illuminate the technological and commercial environment of the inventor, and aid in understanding the state of the art at the time the invention was made") (emphasis added).

---

[12] The "date of patent" is November 9, 2004, but the "prior publication date" is listed as "May 20, 2004". '670 patent p.1.

A0000036

Although the Court's discussion in this part, and a portion of part "c." above, is more directly relevant to the final Graham factor addressing the secondary considerations of nonobviousness, nothing in the jury instructions required the jurors to put such matters out of their minds when determining whether the '631 gas fractionator patent was "relevant" to the problem that Smiths and Morpho were tackling during the 1990s (and Smiths continued tackling into the early 2000s). In grappling with the question of whether the '631 patent was analogous, it would have been reasonable for the jury to ask the following multipart question: "If the dual-tower regenerative gas fractionator discussed in the '631 patent was so pertinent to addressing the problem of extending the life of consumable desiccant in a commercialized portable IMS detector that required an exacting quality of air, then why didn't Smiths' scientists, who were skilled in the art, even consider such solution: (1) when obtaining their 1993 chiller/dryer patent;[13] or (2) when attempting to improve the drying system on Smiths IMS detector products during the late 1990s and early 2000s?" Stated differently, although the failure of Smiths' scientists to identify or learn from the '631 gas fractionator patent while working on improving IMS dryers during the entire 1990s does not

---

[13] Neither Smiths '781 patent application nor Morpho's '670 patent application lists the '631 patent as relevant prior art.

24

demonstrate that such prior patent is not "analogous," it
remains a tool to consider when attempting to turn back the
clock fifteen years (from 2013 to 1998) and determine whether
the '631 patent would logically commend itself to a hypothetical
ordinary artisan. Since the Supreme Court decided KSR, a
renewed emphasis has been placed on "the common sense and
ordinary creativity of a person having ordinary skill in the
art," Norgren Inc. v. Int'l Trade Comm'n, 699 F.3d 1317,
1323 (Fed. Cir. 2012) (emphasis added), and here, it was not
unreasonable for the jury to use its "common sense" in
determining that more than a decade of evidence, demonstrating
that skilled practitioners in the art were not turning to a 20-
year-old "gas fractionator" patent from outside the field,
suggests that such prior patent did not "logically commend
itself" to the problem at hand.

### f.

For the reasons discussed above, "after consideration of
the record as a whole in the light most favorable to [Morpho],"
the Court cannot find that "the evidence presented supports only
one reasonable verdict, in favor of [Smiths]" with respect to
the jury's factual finding that the '631 patent was not
reasonably pertinent to the problem addressed by Morpho's '670
patent and therefore not "analogous" prior art. Dotson, 558
F.3d at 292 (internal quotation marks and citations omitted).

25

The Court acknowledges that, if the Court was the finder of
fact, it would have concluded that the '631 patent is analogous
art to Morpho's '670 patent. However, the Court's
interpretation of the facts is not to be substituted for the
jury's, as long as the jury's finding is "reasonable." See
United States v. Kivanc, 714 F.3d 782, 795 (4th Cir. 2013)
(indicating that, when resolving a Rule 50 motion, the Court
"may not make credibility determinations or substitute [its]
judgment for that of the jury"). Although this Court may not
act as "a rubber stamp convened merely to endorse the
conclusions of the jury," it is "compelled to accord the utmost
respect to jury verdicts and tread gingerly in reviewing them."
Price, 93 F.3d at 1250. The jury's factual finding on this
issue was "reasonable" in light of: (1) the "clear and
convincing" standard the jury was called on to apply by the
requisite question on the verdict form; (2) Dr. Denton's
demeanor, and lengthy and wide-ranging responses; (3) Dr.
Denton's failure to describe the knowledge of someone less
experienced (but of ordinary skill) in the art; (4) Dr. Denton's
apparent reliance on hindsight in defining the "problem"
purportedly solved by the '670 patent; (5) Mr. Jenkins' (Morpho)
testimony as supported by Dr. Nascom's (Smiths) testimony; and
(6) the gloss put on this issue by the fact that Smiths' own
skilled scientists worked for many years on the exact same

26

problem addressed by the '670 patent yet failed to turn to the '631 patent as a possible solution.

### 3. Comparison to Prior Art & Motivation to Combine

The second Graham factor involves a comparison between the claims of the patent in suit and the relevant prior art. Associated with such factor is consideration of whether there was sufficient motivation to combine the prior art references in the manner claimed by the patent in suit. See Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1374 (Fed. Cir. 2008) (concluding, subsequent to KSR, that "some kind of motivation must be shown from some source, so that the jury can understand why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented [invention]") (emphasis added) (citation omitted); Kinetic Concepts, 688 F.3d at 1366 (indicating that even where the patent in suit is a combination of prior art references, an alleged infringer still needs "to proffer evidence indicating why a person having ordinary skill in the art would combine the references to arrive at the claimed invention"). As discussed below, the jury's verdict withstands Rule 50(b) scrutiny as to its finding that Smiths failed to prove by clear and convincing evidence that there was a motivation to combine the relevant prior art references to arrive at the  invention claimed in Morpho's '670 patent.

27

a.

Because the jury reasonably concluded that the '631 patent is not "analogous" prior art, such fact alone counsels against a finding that Smiths carried its burden to demonstrate that there was a motivation to combine the <u>relevant</u> prior art to arrive at the invention disclosed in Morpho's '670 patent. Verdict Form Question 6, ECF No. 360.[14] As recognized by the Federal Circuit, "[t]he combination of elements from non-analogous sources, in a manner that reconstructs the applicant's invention only with the benefit of hindsight, is insufficient to present a <u>prima facie</u> case of obviousness." <u>In re Oetiker</u>, 977 F.2d 1443, 1447 (Fed. Cir. 1992). Accordingly, based on the jury's reasonable factual finding that the '631 patent is not "analogous," the jury reasonably concluded that Smiths did not prove "by clear and convincing evidence that there was a motivation for one of ordinary skill in the art at the time of the invention to

---

[14] The Court need not squarely address the jury's finding as to Question 5 on the verdict form (combination of elements) because Smiths can only demonstrate a prima facie case of obviousness if it proves <u>both</u> that the '670 patent is a combination of prior art elements and that there was a motivation to combine the relevant prior art elements in the same manner as the '670 patent. The Court does note, however, that the testimony of Smiths' expert (Dr. Denton) focused almost entirely on the diagrams and small excerpts from the specification of the '631 patent. His testimony did not mention the fact that the claims of the '631 patent do not cover all dual-bed heat regenerating gas fractionators, but instead cover only those heat regenerating gas fractionators that <u>heat only a portion</u> of the desiccant bed during regeneration (a feature not claimed by Morpho). Accordingly, the jury could have read the '631 patent during deliberations and had reservations as to whether Smiths satisfied the heightened "clear and convincing" evidence standard as to Question 5 based on what appear to be omissions from Dr. Denton's testimony.

28

A0000041

combine . . . U.S. Patent No. [] '631 to Siebert with U.S. Patent No. [] '781 to Davies." Verdict Form Question 6, ECF No. 360.

b.

Alternatively, even if this Court had overturned the jury's factual finding regarding the relevance of the '631 gas fractionator patent and further assumed (against the jury's factual finding) that the '670 patent is merely a combination of elements in the '631 patent and '781 patent, the Court would conclude that the jury returned a reasonable verdict as to its finding that Smiths failed to prove <u>by clear and convincing evidence</u> that, in 1998, one of ordinary skill in the art would have been motivated to combine the '631 patent and '781 patent to arrive at the solution disclosed in Morpho's '670 patent. <u>See</u> Verdict Form Question 6, ECF No. 360. As stated in the jury instructions, and as highlighted by Morpho during its closing argument, "most, if not all, inventions rely on building blocks of prior art" and therefore, Smiths was required to convince the fact-finder that, as of October 1998, "there was a reason that would have prompted a person having ordinary skill in the field of the invention taught by the '670 patent to combine the known elements in a way the claimed invention does." Jury Instr. 20; <u>see</u> <u>Mintz v. Dietz & Watson, Inc.</u>, 679 F.3d 1372, 1378 (Fed. Cir. 2012) (indicating that technical advancement "often occurs through incremental steps toward greater goals," and that unless

29

efforts are taken to avoid the distorting effect of hindsight, "marginal advances in retrospect may seem deceptively simple, particularly when retracing the path already blazed by the inventor"). A motivation to combine can be found implicitly or explicitly in the prior art, or can be demonstrated by proving "by clear and convincing evidence that a person of ordinary skill in the [contraband detector arts] at the time of the invention" would have recognized the problem identified by the inventors and found it obvious to solve such problem in the manner claimed in the invention. Id. at 1377-78.

As argued by Morpho to the jury during its closing, the law does not allow the fact-finder to rely on hindsight to render a patent obvious. More specifically, the Federal Circuit's opinion in Mintz made clear that it is improper to use the invention at issue "to define the problem that the invention solves" because "[o]ften the inventive contribution lies in defining the problem in a new revelatory way." Id. at 1377. Stated differently, "when someone is presented with the identical problem and told to make the patented invention, it often becomes virtually certain that the artisan will succeed in making the invention."[15] Id.

---

[15] Here, Morpho presented evidence indicating that Smiths succeeded in designing an IMS detector with a dual-tower alternating regenerative dryer not because Smiths identified such solution through the prior art, but because Smiths heard about Morpho's Itemizer 3 IMS detector product and its regenerative drying system and later purchased such

30

Taking steps to avoid a prohibited "hindsight construction" that impermissibly relies on the invention itself to define the problem solved by such invention, it is evident from the trial testimony and documentary record that the problem addressed by Morpho's invention is the same problem that was being tackled by the entire IMS industry for many years—finding a way to increase the life of the consumable desiccant in an IMS detector designed for use in the field.[16] In re Kahn, 441 F.3d 977, 988 (Fed. Cir. 2006) ("In considering motivation in the obviousness analysis, the problem examined is not the specific problem solved by the invention but the general problem that confronted the inventor before the invention was made."). The problem is not properly framed as creating an internal regenerating dryer for a IMS detector device designed for field use that is capable of regenerating while the detector operates (i.e., is capable of continuous use), nor is it properly framed in reference to an IMS detector dryer that never needs to have its desiccant

---

product which contained the technology that Smiths was apparently struggling to design. Accordingly, viewing the evidence in Morpho's favor, Smiths actually needed more to succeed than being "presented with the identical problem and told to make the patented invention," id.; Smiths needed to peek at Morpho's actual design before it achieved its own success.

[16] It was self-evident during trial that neither Smiths nor Morpho was focused on designing an IMS product for laboratory use, where "zero air" or other external clean air sources are often readily available. Rather, the challenge was to design a detector for use at airports, secured buildings, and other "field" uses.

A0000044

replaced.[17]     Such    constructions    would    improperly    rely    on

hindsight  to  define  the  problem,  and  in  actuality,  come  closer

to  defining  the  problem  as  it  existed  for Smiths  while  it  tried

to  play  "catch-up"  after  Morpho's  Itemizer  3  product  was

commercialized.  See  Mintz,  679  F.3d  at  1377  (holding  that  the

district  court  committed  error  by  "us[ing]  the  invention  to

define  the  problem  that  the  invention  solves");  cf.  Nascom  Video

Depo.  46:3-46:17  (testimony  from  Smiths'  scientist  indicating

that  Smiths  "needed  to  go  to  an  internal  regenerative  gas

supply"  based  on  "customer  demand"  that  resulted  from  Morpho's

Itemizer  3  "already  being  sold  with  a  regenerative  system  in

it").

Based  on  the  above,  it  appears  that  Smiths'  expert,  Dr.

Denton,  provided  a  flawed  analysis  when  he  testified  at  trial

about  motivation  to  combine  as  he  improperly  framed  "the

problem"  as  designing  an  IMS  detector  with  a  dryer  capable of

continuous use.  Dr. Denton  testified:

> If  one  wanted  a  continuous  supply  of  dry  air,  one
> would  simply  substitute  the  '631  for  the  drying  system
> in  '781.  We've  already  done  that.  And  common  sense
> tells  you  that  if  you  need  a  continuous  flow  of  dry

---

[17] Notably,  even  after  Smiths  finalized  and  commercialized  its  IMS
detector  product  that  utilized  an  alternating  regenerative  dryer,  the
trial  evidence  demonstrated  that  Smiths  recommended  that  its  customers
perform  daily  "bake  outs"  of  the  IMS  detector  (a  several  hour  self-
cleaning  process)  and  that  customers  replace  the  desiccant  towers
every year.  Accordingly,  Smiths'  own  IMS  detector  product  does  not
appear  to  be  specifically  designed  to  achieve  24/7  operation,  nor  does
it  appear  to  be  aimed  at  incorporating  a  drying  system  that  uses  non-
consumable  permanent  desiccant.

32

air, having two dryers[,] one [] in operation, one
being regenerated, and switch[ing] back and forth
between those would provide a continuous flow. And
then prior art has a whole series of examples[18] of dual
column dryers being used with a variety of different
detector technologies.

. . .

And this is, again, if one needed continuous flow of
operation, '631, as we've pointed out earlier, talks
about maintaining substantially continuous flow of
influent gas and does that in multiple places.

Trial Tr. 733-34, ECF No. 355 (emphasis added). Because Dr.

Denton improperly framed "the problem" addressed by the '670

patent when testifying about a motivation to combine, and

because Morpho repeatedly highlighted (during trial and during

closing arguments) the prohibition against reliance on

hindsight, it would have been reasonable for the jury to afford

Dr. Denton's testimony on this issue limited weight. Mintz, at

1377; cf. Callaway Golf Co. v. Acushnet Co., 576 F.3d 1331,

1342 (Fed. Cir. 2009) (affirming the district court's decision

to preclude the introduction of certain evidence at trial

because such evidence "ran a substantial risk of leading the

jury towards the inappropriate use of hindsight and towards

unduly weighting [the defendant's] arguments concerning

motivation to combine the prior art; the likely outcome, as the

district court perceived it, was the jury understanding [the

---

[18] The only question posed to the jury, and thus the only question this
Court is called on to review on a Rule 50(b) motion, is whether there
was a motivation to combine the '631 gas fractionator patent and the
'781 IMS detector patent.

33

**A0000046**

defendant's] argument concerning the combination of prior art as '[w]e did it, here it is, anyone can do this'").

Assuming the jury afforded Dr. Denton's testimony, on motivation to combine, limited weight, the jury may have looked to other evidence to determine whether Smiths carried its burden on this issue <u>by clear and convincing evidence</u>. In doing so, in an effort to turn back the clock and understand the viewpoint of a hypothetical ordinary skilled artisan, the jury may have considered the following evidence: (1) throughout the 1990s, the commercialized IMS detector industry was facing a problem associated with the <u>short life</u> and <u>high cost</u> of consumable desiccant used in field IMS detectors; (2) in 1993, Smiths patented an advancement aimed at extending the life of desiccant in such detectors from weeks to months by patenting the concept of adding an internal "chiller" that removed water from the air-stream before such air came into contact with the consumable desiccant; (3) in 1998, Morpho patented a far more effective advancement that extended the life of desiccant in field IMS detectors from weeks, or months, to years by patenting the concept of using two alternating regenerative dryers inside an IMS detector device; and (4) in the late 1990s and early 2000s, when Smiths was working on improving/redesigning its dryer technology for its commercialized IMS detectors, <u>in part because</u> <u>customers were dissatisfied with the cost and efforts necessary</u>

34

to replace the consumable desiccant, despite the efforts of its
skilled scientists, Smiths initially did not identify a dual-
tower alternating regenerative dryer as a solution,[19] and later
struggled to engineer the solution set forth in Morpho's '670
patent even after the "problem" was recast in a way that more
directly pointed Smiths toward using a regenerating system.[20]

---

[19] For example, Morpho introduced an exhibit (a letter dated August 24,
2001) indicating that almost three years after Morpho applied for its
'670 patent, Smiths had identified one of the design "problems" it was
addressing as "increase[ing] the life of the desiccant canister" and
that Smiths and one of its suppliers had discussed using a longer
"nafion tube" to improve the drying capability of Smiths IMS detector.
Morpho's Trial Exhibit PTX 94; Trial Tr. 612-13, ECF No. 356; Trial
Tr. 762-63, ECF No. 355. Similarly, an internal Smiths' document
dated December 8, 2001, as well as Smiths' own expert's testimony
suggested that in December of 2001, Smiths was discussing several
options regarding redesign of its detector drying system and had not
yet, at least in writing, identified a "dual-tower regenerative dryer"
as a solution. Smiths' Trial Exhibit DTX 95; Trial Tr. 764-66, ECF
No. 355.
    It is also notable that the jury also heard evidence at trial
indicating that Smiths infringing "500DT" IMS detector product, which
was larger than Morpho's Itemizer 3 product, actually had two IMS
detector drift tubes inside of it, and thus, it required twice as much
drying power as Smiths' prior detectors which contained a single IMS
drift tube. Because such design change required that Smiths improve
on its drying technology during the early 2000s to ensure that the
customer base accepted such new product, Smiths had all the more
reason to turn to the purportedly "obvious" and very effective
solution of a dual-tower alternating regenerating dryer.
Nevertheless, when viewed in favor of Morpho, the trial evidence
revealed that Smiths' skilled scientists failed to identify such
solution until after they heard about Morpho's Itemizer 3 product.

[20] The jury heard evidence that even after adding a dual tower
alternating drying system to its design-phase schematics, Smiths'
drawings continued to include "nafion tube" and/or "chillers," that
were designed to aid in the drying process, suggesting that Smiths did
not appreciate the effectiveness of a dual-tower alternating
regenerative dryer. Smiths later dropped such additional drying
mechanisms. The jury also heard evidence that Smiths reached out to a
sister company in 2003 when it was struggling to design a suitable

35

A0000048

After the problem addressed by Morpho's '670 patent is properly framed as the need to create a more efficient drying system for a field IMS detector that extends the life of the consumable desiccant, Smiths cannot demonstrate that the jury's factual finding on question six on the verdict form was "unreasonable." Dr. Denton's testimony identified the incorrect "problem" at issue, and Smiths therefore failed to carry its burden by clear and convincing evidence to demonstrate that, in 1998, "it would have been obvious to try the combination of elements" in the '631 patent and the '781 patent or that the prior art "teaches or suggests the desirability of combining [such] elements." Jury Instr. 20.

Furthermore, although not dispositive of how an ordinary hypothetical artisan would be motivated, it would have been reasonable for the jurors to consider the following: (1) In light of the fact that Dr. Denton testified on cross-examination that regenerative dryers and IMS detectors had both been around since the late 1960s, Trial Tr. 751, ECF No. 355, why didn't anyone in the IMS detector industry make the combination in the 1960s, 1970s, 1980s, or early/mid 1990s?; (2) Why didn't Smiths make the combination in 1993 when it applied for its '781 IMS patent which was expressly aimed at solving the exact same

regenerative system for its IMS detector device. Trial Tr. 647-48, ECF No. 356.

36

problem addressed by Morpho's '670 patent?; and (3) Why did Smiths struggle to figure out such combination as a solution in the late 1990s and early 2000s when Smiths' new IMS detector product was going to require twice as much drying power as its prior product?  Because "the proper analysis requires a form of amnesia that 'forgets' the invention and analyzes the prior art and understanding of the problem at the date of invention," Mintz, 679 F.3d at 1377, it would have been reasonable for the jury to consider such real-world evidence in attempting to perform the difficult task of turning the clock back fifteen years and putting themselves in the shoes of an artisan of ordinary skill.

Considering these facts, as well as the rest of the trial evidence in a light most favorable to Morpho, and taking the necessary steps to avoid hindsight reconstruction, the Court finds that the jury's factual findings as to question six on the verdict form were "reasonable."  Smiths' contention that Dr. Denton's "unrebutted" testimony on such point establishes a motivation to combine is undercut by the fact that Dr. Denton improperly relied on hindsight when framing his opinion. Accordingly, even assuming the '631 patent to be relevant prior art, the jury reasonably concluded that Smiths failed to carry its burden to prove by clear and convincing evidence that there

37

was a motivation to combine the '631 patent and '781 patent as of October, 1998.[21]

### 4. Secondary Considerations of Nonobviousness

The final disputed Graham factor involves the jury's factual findings regarding the secondary considerations of nonobviousness. The Court's analysis on such factor is intentionally abbreviated in light of the fact that Morpho's showing on the secondary considerations can only be classified as strong. As discussed below, the jury's factual finding was reasonable as to each of the five subparts of question seven on the jury verdict form because the trial evidence, viewed in Morpho's favor, was plainly sufficient for Morpho to demonstrate such facts by a preponderance of the evidence. See Verdict Form q.7 (questions about commercial success, a long-felt but unresolved need, the failure of others, industry praise, and copying by others).

---

[21] Even after Smiths purchased an Itemizer 3 and finalized and commercialized its own IMS detector device with an internal dual tower regenerative dryer, Smiths' internal documents from 2010 suggest that it was unsure whether the desiccant should be replaced yearly, or whether it could last up to ten years before it needed replacement. Trial Tr. 605-07, ECF 356. Smiths' ongoing questions as to the effectiveness of its own internal dual tower alternating regenerative drying system further suggests that such solution was "inventive" as it yielded somewhat "unexpected" results in that it appears to have yielded a far longer desiccant life than Smiths anticipated. See KSR, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."); cf. In re Rouffet, 149 F.3d 1350, 1355 (Fed. Cir. 1998) (stating that the "objective evidence of nonobviousness includes . . . unexpected results created by the claimed invention, [and] unexpected properties of the claimed invention).

38

A0000051

The trial evidence demonstrated the following facts: (1) that Morpho's Itemizer 3 IMS detector was <u>commercially successful</u> at least in part based on its internal dual tower regenerating desiccant dryer—notably, Smiths' own internal marketing documents from 2003 indicate that due to the high cost of replacement desiccant "[f]rom a competitive point of view there is a strong necessity to remove [the desiccant] as a consumable (i.e. <u>regenerating air purification is necessary</u>)," Smiths Trial Exhibit DTX 106; Trial Tr. 774-76, ECF No. 355 (emphasis added); (2) that, as of October of 1998, there was a <u>long-felt but unresolved need</u> for improvements in IMS dryer technology designed for field use, evidenced in part by Smiths' 1993 patent that added a chiller in order to <u>extend the life of the consumable desiccant</u>; (3) that Smiths actively worked to improve IMS detector dryer technology in the 1990s and early 2000s, both through obtaining a patent and through redesigns of its own commercialized products, yet, when the trial evidence is viewed in Morpho's favor, it demonstrates that <u>Smiths repeatedly failed to identify a regenerative dryer as a solution to the longstanding industry problem</u>; (4) that Morpho's regenerative dryer received praise <u>from Smiths</u>, Morpho's biggest competitor in the IMS detector industry; and (5) that Smiths purchased and examined Morpho's commercialized regenerative dryer shortly before finalizing Smiths' design of its own regenerative dryer,

39

A0000052

which when all of the relevant evidence is viewed in a light most favorable to Morpho, <u>supports the inference of copying</u>.

In its' Rule 50(b) motion, Smiths argues that Morpho's commercialized Itemizer 3 product is irrelevant to the secondary considerations of nonobviousness because Morpho failed to prove that such product is an embodiment of the '670 patent. Smiths does not contend that the Itemizer 3 lacks a dual tower regenerative alternating dryer as claimed in the '670 patent, but instead argues that other differences exist between the manner in which the Itemizer 3 operates and the manner in which the claims in the '670 patent describe an IMS detector operating.[22] Viewing the evidence in a light most favorable to

---

[22] Smiths contends that Morpho, through its expert Dr. Bell, was required by law to provide the equivalent of a claim by claim infringement analysis prior to Dr. Bell offering the opinion that Morpho's Itemizer 3 product was an embodiment of Morpho's own '670 patent. Smiths, however, cites no law in support of this contention, and instead relies solely on cases discussing the necessary analysis before an expert is permitted to opine that a patent is infringed upon by a competitor's product. Smiths, therefore, fails to demonstrate a sound legal basis for its argument, and the Court rejects the assertion that Morpho's evidence was insufficient as a matter of law to permit the jury to consider the Itemizer 3 when determining the secondary considerations of nonobviousness. Although Smiths plainly is of the view that the Itemizer 3 does not practice Claim 20 of the '670 patent, Smiths falls short of demonstrating that the only reasonable interpretation of the trial evidence is that the Itemizer 3 is not covered by either claim 20, or any of the other disputed claims at issue in this case.

To further clarify this issue, Smiths argues that because the Itemizer 3 utilizes a different air flow than that described in certain figures and claim terms in the '670 patent, Morpho has in essence "designed around" its own patent. Therefore, even though some of the success of Morpho's Itemizer 3 product has been directly tied to Morpho's breakthrough in IMS detector regenerative drying, Smiths contends that such real-world success is legally irrelevant to the

40

A0000053

Morpho, including Dr. Bell's testimony, the Court finds that the jury appropriately relied on the Itemizer 3 as an embodiment of the '670 patent.

For the reasons discussed above, after considering all of the evidence presented at trial, and viewing the evidence in the light most favorable to Morpho, the Court finds that the jury reasonably found in favor of Morpho on each of the five subparts of question seven of the verdict form.

---

obviousness analysis. However, in light of the direct tie between the inventive concept and a degree of the Itemizer 3's commercial success, the Court alternatively finds that even if Morpho's evidence was somehow lacking regarding which claim term the Itemizer 3 was practicing based on its air flow, the Itemizer 3 remained relevant to the jury's analysis of the secondary considerations of nonobviousness. See Power-One, Inc. v. Artesyn Techs., 599 F.3d 1343, 1352 (Fed. Cir. 2010) ("[Plaintiff] presented evidence of praise in the industry that specifically related to features of the patented invention, linking that industry praise with the patented invention."). Notably, here, the jury did not have to "presume" that the Itemizer 3 was successful because of its regenerative drying system—Smiths' own internal company documents and the testimony of its own scientist (Dr. Nascom) demonstrate that utilizing a regenerative drying system like that in Morpho's Itemizer 3 was a "necessity" in order for Smiths to stay competitive in the industry. Stated differently, customers were demanding what only Morpho had achieved. Cf. Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1327-28 (Fed. Cir. 2008) (indicating that secondary considerations are only accorded "substantial weight" if there is a "nexus between the merits of the claimed invention and evidence of secondary considerations[;] . . . "[p]ut another way, commercial success or other secondary considerations may presumptively be attributed to the patented invention only where the marketed product embodies the claimed features, and is coextensive with them") (internal quotation marks and citations omitted) (emphasis added). Accordingly, if the Itemizer 3 was successful based on the patented regenerating drying system, and the Itemizer 3 was copied for its patented regenerating drying system, and the Itemizer 3 satisfied a long-felt need as a result of its patented regenerating drying system, then such evidence is relevant to determining the secondary factors of nonobviousness associated with such regenerating drying system.

41

A0000054

## 5. Legal Ruling on Obviousness

### a.

Because Smiths fails to demonstrate that any of the jury's factual findings should be set aside as unreasonable, the legal determination of obviousness, previously made by the Court, remains very one-sided in favor of Morpho. <u>See</u> ECF No. 364. Accordingly, there is no basis for the Court to disturb its prior ruling, and it therefore declines to do so.

### b.

Alternatively, even assuming, arguendo, that the Court ruled in favor of Smiths on its Rule 50(b) motion as to the first two <u>Graham</u> factors, and thus concluded that Smiths had presented a "prima facie" case of obviousness, the Court's legal finding of nonobviousness would stand undisturbed based on the objective evidence demonstrating that, on these case-specific facts, the objective indicia of nonobviousness rebut the prima facie case. <u>See</u> <u>Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.</u>, 617 F.3d 1296, 1305 (Fed. Cir. 2010) ("While it is true that we have held in individual cases that objective evidence of nonobviousness did not overcome the strong prima facie case-<u>this is a case-by-case determination</u>.") (emphasis added); <u>Mintz</u>, 679 F.3d at 1378 (indicating that the objective indicia of nonobviousness are "powerful tools for courts faced with the difficult task of avoiding subconscious

42

A0000055

reliance on hindsight" and that they serve as a "built-in protection" that helps to "place a scientific advance in the proper temporal and technical perspective <u>when tested years later for obviousness against charges of making only a minor incremental improvement</u>") (emphasis added); <u>KSR</u>, 550 U.S. at 418-19 (indicating that a patent is not obvious merely because it is a combination of prior art elements because it is necessary to consider "the effects of demands known to the design community or present in the marketplace"). As discussed below, the unique facts in this case, including the fact that the litigants are the two major players in an industry that struggled for years to improve on dryer technology without sacrificing detector performance, reveal that the objective indicia of nonobviousness outweigh Smiths' (assumed) prima facie case.

The trial evidence, including Smiths '781 patent, demonstrated that the IMS detector industry struggled during the 1990's to develop a way to reduce the industry's reliance on consumable desiccant <u>without sacrificing performance of the IMS detector</u>. The jury heard evidence demonstrating that IMS detectors require an exacting quality of clean dry air and that precision reliable operation of the IMS detector itself was critical to success in the industry. Notwithstanding the long-felt need for improvement in IMS detector dryer technology,

43

**A0000056**

Smiths' own internal documents demonstrate that years after Morpho's '670 patent application was filed (but not yet published), Smiths' own scientists failed to identify an internal dual tower alternating regenerative dryer as a solution to such problem. These events occurred notwithstanding the fact that the '631 patent had been issued for 30 years. Such real-world evidence demonstrating that a need existed for years, yet went unfulfilled, undercuts the prima facie case. See Transocean, 699 F.3d at 1349 ("Objective evidence of nonobviousness is an important component of the obviousness inquiry because 'evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not.'" (quoting Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983))) (emphasis added); Crocs, Inc. v. Int'l Trade Comm'n, 598 F.3d 1294, 1310 (Fed. Cir. 2010) ("Secondary considerations 'can be the most probative evidence of non-obviousness in the record, and enables the . . . court to avert the trap of hindsight.'" (quoting Custom Accessories, Inc. v. Jeffrey-Allan Indus., 807 F.2d 955, 960 (Fed. Cir. 1986))).

The trial evidence also demonstrated that once Morpho's Itemizer 3 product reached the market, it was successful. More importantly, however, is that Morpho directly tied at least a

44

A0000057

portion of such success to the Itemizer 3's <u>advancement in</u> <u>regenerative drying</u>, as set forth in Morpho's '670 patent. Morpho did so in part through evidence of the feedback received from IMS detector customers. Furthermore, as discussed above, Smiths' own records indicate that "[f]rom a competitive point of view there is a <u>strong necessity</u> to remove [the desiccant] as a consumable (i.e. <u>regenerating air purification is necessary</u>)." Smiths' Trial Exhibit DTX 106; Trial Tr. 774-76, ECF No. 355 (emphasis added). Smiths' own scientist further proved such point by testifying that there was customer demand <u>for</u> <u>regenerative drying</u> in the early 2000s <u>because</u> Morpho's Itemizer 3 was being sold with a regenerative system. Nascom Video Depo. 46:3-46:17. When, prior to litigation, the accused infringer identified the disputed technology "as a significant advance" and "touted the advantages" of it, such "recognition of the importance of this advance is relevant to a determination of nonobviousness." <u>Gambro Lundia AB v. Baxter Healthcare Corp.</u>, 110 F.3d 1573, 1579 (Fed. Cir. 1997).

As suggested above in the discussion about the "long-felt need" in the industry, the trial evidence also established "failure of others" because it was readily apparent that Smiths, self-identified during opening statements as the "gold-standard" in IMS detector technology, devoted efforts in the 1990s and early 2000s toward improving its IMS detector dryer technology.

45

**A0000058**

Smiths, however, repeatedly failed to identify an internal dual-tower regenerating dryer as a solution to the consumable desiccant problem. Furthermore, even after Smiths discovered that Morpho had successfully designed a regenerating dryer for its Itemizer 3 IMS detector product, Smiths struggled to design its own IMS detector regenerating dryer. The strength of Morpho's evidence on such point cannot be understated, and this fact provides a very effective rebuttal to Smiths' suggestion at trial that "anyone" in the industry could have figured this out based on the prior art. "Indeed, the litigation argument that an innovation is really quite ordinary carries diminished weight when offered by those who had tried and failed to solve the same problem, and then promptly adopted the solution that they are now denigrating." Heidelberger Druckmaschinen AG v. Hantscho Commercial Prod., Inc., 21 F.3d 1068, 1072 (Fed. Cir. 1994) (emphasis added).

Although the above objective, real-world factors appear to be enough to rebut the (assumed) prima facie case, Morpho also demonstrated at trial that it received praise from Smiths based on Morpho's advancement in IMS dryer technology. Additionally, even though Smiths strongly disputes such fact, one reasonable interpretation of the evidence is that Smiths copied Morpho's technology through purchasing an Itemizer 3 and using it to aid in overcoming Smiths' struggles designing an internal dual tower

46

regenerating dryer suitable for use with its IMS detector. See, e.g., Nascom Video Depo. 74:7-74:8 (testimony of Smiths' scientist indicating that he personally examined the Itemizer 3 because of "a combination of [his] curiosity to understand the design feature and to learn"). These additional two "secondary considerations" further demonstrate that even if a prima facie case of obviousness is assumed, the real-world objective proof of nonobviousness is more than enough to rebut the prima facie case. See Power-One v. Artesyn Techs., 599 F.3d 1343, 1351-52 (Fed. Cir. 2010) (concluding that the secondary considerations of nonobviousness supported the jury's conclusion that the disputed patent was not invalid, explaining that "praise from a competitor tends to indicate that the invention was not obvious" and that a competitor's "contemporaneous reaction to [an] invention" of launching its own infringing product, can "demonstrate the unobviousness of the invention").

For the above stated reasons, even if a prima facie case of obviousness is assumed, when the trial evidence is viewed in Morpho's favor, it is clear that Morpho's factual showing on the secondary considerations of nonobviousness were so strong that the case specific objective facts "trump" the prima facie case, and support a finding in Morpho's favor as to the ultimate question of obviousness. Stated differently, when all of the trial evidence is considered, and all the Graham factors are

47

taken into account, Smiths fails to overcome the presumption of validity of Morpho's '670 patent by clear and convincing evidence. The Court therefore would uphold its legal finding of nonobviousness even if it had concluded that the facts can only be reasonably interpreted to support a prima facie case of obviousness. Smiths Rule 50(b) motion is therefore **DENIED** to the extent Smiths' challenges the findings associated with obviousness.

## C. Infringement & Lost Profits Discussion - Rule 50(b) motion

Separately, Smiths argues that the asserted claims of the '670 patent are not infringed as a matter of law and that even if they are, Morpho failed to prove that it was entitled to lost profits. Viewing the evidence in a light most favorable to Morpho, there was more than sufficient evidence adduced at trial to support the jury's findings as to direct infringement, induced or contributory infringement, and lost profits. Verdict Form Questions 1-2, 9-10, ECF No. 360. Accordingly, Smiths' Rule 50(b) motion is **DENIED** as to Smiths' challenges to the jury's finding of direct infringement, induced or contributory infringement, and lost profits.

## III. Rule 59(a) Motion for a New Trial

### A. Rule 59(a) Standard

Similar to a motion for judgment as a matter of law, in a patent case, the law of the regional circuit governs a motion

48

A0000061

for a new trial.  *Bettcher Industries, Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 638 (Fed. Cir. 2011).  Rule 59(a) states that a district court "may, on motion, grant a new trial on all or some of the issues--and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  As explained by the Fourth Circuit:

> A new trial will be granted [under Rule 59(a)] if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."  The decision to grant or deny a new trial is within the sound discretion of the district court, and we respect that determination absent an abuse of discretion.

*Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).  Unlike a Rule 50(b) motion, "[u]nder Rule 59 of the Federal Rules of Civil Procedure, a trial judge may weigh the evidence and consider the credibility of the witnesses and, if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial."  *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989) (citing *Wyatt v. Interstate & Ocean*

49

Transp. Co., 623 F.2d 888, 891-92 (4th Cir. 1980), and Williams
v. Nichols, 266 F.2d 389, 392 (4th Cir. 1959)).

### B. Discussion – Rule 59(a) motion

Smiths' motion for a new trial advances three primary
arguments: (1) the Court erred in excluding the testimony of
Smiths' experts Drs. Harrington and Ruthven on the issues of
noninfringement and invalidity; (2) the Court erred in
permitting Morpho to argue that its Itemizer 3 product was
relevant to the objective indicia of nonobviousness; and (3)
that the jury's verdict on infringement, validity, and damages
are against the weight of the evidence.

### 1. Exclusion of Experts

For the reasons previously stated by the Court when
granting, in part, Morpho's motion in limine seeking to exclude
the testimony of Smiths' experts Dr. Harrington and Dr. Ruthven,
ECF No. 312, and those stated in Morpho's brief in opposition to
Smiths' new trial motion, ECF No. 380, Smiths' motion for a new
trial is denied on this ground. Critically, the Court's ruling
did not bar such witnesses from testifying, but instead,
applying Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d
1356, 1361 (Fed. Cir. 2008), concluded that such witnesses were
free to testify as experts in their respective areas of
expertise, but could not testify as to "infringement" or
"obviousness" because they did not possess the minimal

50

**A0000063**

qualifications necessary to be deemed "a person of ordinary skill in the art."

At trial, Smiths revealed its desire to essentially conduct an infringement analysis with Dr. Harrington, seeking to examine the disputed component parts of Smiths' "500DT" commercialized IMS detector. Smiths represented to the Court that it would not ask its experts the ultimate questions "does Smiths' product infringe?" or "is Morpho's patent invalid as obvious?" but it was clear from Smiths' proffered line of questioning that it sought to conduct the equivalent of an infringement and obviousness analysis even though its witnesses were not qualified in the art. <u>In light of such proffered testimony</u>, the Court concluded that testimony that was the functional equivalent of an infringement analysis (or obviousness analysis) by an individual not qualified in the art was improper under <u>Sundance</u>. Smiths' post-trial motion fails to alter this Court's viewpoint on such matter, and thus, Smiths' motion for a new trial is **DENIED** as to such ground.[23]

### 2. Relevance of Morpho's "Itemizer 3"

For the reasons stated more fully in the Court's analysis of the secondary considerations of nonobviousness, and for the

---

[23]  A new trial is likewise not warranted based on the Court's denial of Smiths' motion to reconsider the Court's ruling as to Dr. Harrington. Furthermore, as noted in Morpho's brief in opposition to Smiths' new trial motion, it appears that Smiths obtained the necessary testimony about the "operation" of Smiths' "500 DT" IMS detector that was accused of infringement through Dr. Reno De Bono.

A0000064

reasons stated in Morpho's brief in opposition to Smiths' new trial motion, ECF No. 380, Smiths' motion is denied to the extent it seeks a new trial based on the admission of objective evidence associated with Morpho's Itemizer 3 IMS detector. Smiths fails to establish that Morpho's evidence was fundamentally flawed with respect to the nexus between the commercial success of the Itemizer 3 and the patented feature of an internal dual tower alternating regenerative dryer for use in an IMS detector device. See Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1574 (Fed. Cir. 1996) ("It is within the province of the fact-finder to resolve these factual disputes regarding whether a nexus exists between the commercial success of the product and its patented features . . . ."). Not only is the "nexus" a factual question for the jury, but Dr. Bell testified that Morpho's Itemizer 3 was an embodiment of the '670 patent. Smiths' new trial motion is therefore **DENIED** as to this ground.

### 3. Weight of the Evidence

As indicated above, the Court is well-aware that, unlike a Rule 50(b) motion, the standard applicable to a new trial motion permits the Court to consider the weight of the evidence and the credibility of witnesses in determining whether to grant a new trial. Having attentively listened to all the witnesses testify at trial and having considered the admitted exhibits, and after

52

A0000065

carefully reviewing the briefs before the Court, for the reasons
argued in Morpho's brief in opposition, ECF No. 380, the Court
does not find that the jury's verdict was against the weight of
the evidence as to its findings of infringement or lost profits.
A new trial is therefore not warranted on these grounds.

As to obviousness, a new trial is likewise not warranted
because even if the Court found that the jury's factual findings
relevant to the prima facie case of obviousness was against the
weight of the evidence, such fact is rendered moot by the
strength of the evidence supporting the jury's factual finding
as to the secondary considerations of nonobviousness, and the
Court's legal finding that the secondary considerations outweigh
any assumed prima facie case. Stated differently, Smiths has
failed to demonstrate that the jury's advisory finding (or the
Court's subsequent legal finding) as to the ultimate question of
obviousness is not supported by substantial evidence. To the
contrary, the secondary considerations of nonobviousness in this
case can only be describing as "strong"—so strong that they
support a legal finding of nonobviousness even if a prima facie
case of obviousness is assumed. See Transocean, 699 F.3d at
1349 ("Objective evidence of nonobviousness . . . 'may often
establish that an invention appearing to have been obvious in
light of the prior art was not." (quoting Stratoflex, Inc., 713

53

F.2d at 1538)).  Smiths' motion is therefore **DENIED** as to this ground.

### IV. Conclusion

For the reasons set forth above, Smiths' Rule 50(b) motion for judgment as a matter of law (ECF No. 368), and Rule 59(a) motion for a new trial (ECF No. 370) are **DENIED**.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

It is so **ORDERED**.

/s/ Mark S. Davis

Mark S. Davis
United States District Judge

Norfolk, Virginia
July 11 , 2013

A0000067

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



FILED

NOV 3 0 2012

CLERK, US DISTRICT COURT
NORFOLK, VA

MORPHO DETECTION, INC.,

        Plaintiff,

v.                          CIVIL ACTION NO. 2:11cv498

SMITHS DETECTION, INC.,

        Defendant.

## MEMORANDUM ORDER

This matter is before the Court on two motions to exclude expert testimony filed by Morpho Detection, Inc. ("Morpho") in this patent infringement suit. ECF Nos. 93 & 99. The asserted claims at issue in Morpho's U.S. Patent No. 6,815,670 (the "'670 patent") are directed to methods and devices for detecting trace amounts of materials. Morpho alleges that Smiths' IonScan 500DT product infringes the asserted claims. Such accused device contains ion mobility spectrometry ("IMS") detectors used to detect and identify organic compounds, including explosives and narcotics. For the reasons set forth below, the motion addressing Dr. Harrington's opinions, ECF No. 93, is **GRANTED**, and the motion addressing Dr. Ruthven's opinions, ECF No. 99, is **GRANTED** in part, deemed **MOOT** in part, and **DENIED** in part.

## I. Motion to Exclude Testimony of Dr. Harrington

Morpho seeks, under Fed. R. Evid. 702, to exclude the expert testimony of Peter de Boves Harrington, Ph.D. on the issue of non-infringement. In the early stages of claim construction, Morpho agreed to adopt *Smiths Detection, Inc.'s* (*"Smiths"*) proposed definition for one having skill in the art of the '670 patent. That definition included the following two qualifications:

1. at least a B.S. in mechanical engineering, chemical engineering, physics, or chemistry (or equivalent experience); and

2. at least three years of work experience in designing pneumatics and gas purification systems for analytical instruments.

Morpho argues that:

> [u]nder the patent law, an expert is only allowed to opine on infringement if he or she qualifies as one skilled in the art. During his deposition, Dr. Harrington admitted that he is not skilled in the art because he does not have any experience in designing pneumatics and gas purification systems for analytical instruments. Because he does not qualify as one 'skilled in the art' under the parties' agreed-to definition for that term, Dr. Harrington's testimony regarding non-infringement should be excluded.

ECF No. 94.

Smiths responds by claiming "Morpho's argument relies on the wrong technical expert qualification standard – an expert need not be 'a person of ordinary skill in the art' (by definition, no "expert" is)." ECF No. 125. Smiths goes on to

A0000069

argue that the Federal Circuit's holding in <u>SEB S.A. v. Montgomery Ward & Co., Inc.</u>, 594 F.3d 1360 (Fed. Cir. 2010) makes clear that Morpho has mischaracterized the holding of <u>Sundance, Inc. v. DeMonte Fabricating, Ltd.</u>, 550 F.3d 1356 (Fed. Cir. 2009) on this issue, and that other recent cases "hold that a technical expert need not, in order to testify on issues related to infringement and validity, meet the definition of one of ordinary skill in the art." ECF No. 125.

Morpho replies that "[a]lthough Dr. Harrington may be qualified to testify within his area of expertise - the science and operation of IMS detection instruments generally - he should not be permitted to offer expert testimony at trial on non-infringement." ECF No. 146. To allow such testimony would, according to Morpho, expose the jury to unreliable, highly persuasive expert testimony. Morpho further replies that Smiths' reliance on <u>SEB</u> is inapposite because the opinion testimony offered in that case did not relate to invalidity or non-infringement, and did not include opinions on the disclosure of particular art references, the motivation to combine those prior art references, or any other issue that requires interpretation from the perspective of one having at least ordinary skill in the art.

The Court agrees with Morpho. Dr. Harrington admitted that he does not have the experience of one of ordinary skill in the

3

A0000070

art, which definition was agreed upon by the parties. Therefore, he is not qualified to testify as an expert witness on the issue of non-infringement. <u>Sundance</u>, 550 F.3d at 1361; <u>Borgwarner, Inc. v. Honeywell Int'l, Inc.</u>, 750 F. Supp.2d 596, 601 n. 3, 610-12 (W.D.N.C. 2010) (reviewing standard for admission of expert testimony in Fourth Circuit and excluding expert opinion on same grounds as in <u>Sundance</u>). Morpho concedes that Dr. Harrington is qualified to testify as an expert on the science and operation of IMS detection instruments generally, which falls within his expertise as an expert in ion mobility spectrometry, and the Court agrees. Dr. Harrington may so testify. Accordingly, Morpho's motion is **GRANTED**.

## II. Motion to Exclude Testimony of Dr. Ruthven

Morpho seeks, under Fed. R. Evid. 702, to exclude the expert testimony of Douglas M. Ruthven, Ph.D., Sc.D., on the issues of infringement, invalidity, the substance and disclosure of the prior art, and the existence of non-infringing substitutes. Similar to Dr. Harrington, Dr. Ruthven does not possess the minimum experience necessary to qualify as a person of ordinary skill in the art based on the parties' stipulated definition.

Accordingly, for the same reasons discussed above, Morpho's motion to exclude Dr. Ruthven's testimony is **GRANTED**, in part, to the extent that Dr. Ruthven seeks to testify on issues of

4

invalidity, or the substance and disclosure of the prior art, to include how a person of ordinary skill in the art would understand the prior art and whether such a person would be motivated to combine such art. See Sundance, 550 F.3d at 1363 ("Nor may a witness not qualified in the pertinent art testify as an expert on obviousness, or any of the underlying technical questions, such as the nature of the claimed invention, the scope and content of prior art, the differences between the claimed invention and the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention."). However, Dr. Ruthven is not precluded from testifying generally as an expert in the science of adsorption and adsorption processes, including air drying.

The portions of Morpho's motion challenging Dr. Ruthven's proposed opinions on infringement are deemed **MOOT** because Smiths recently indicated that Dr. Ruthven no longer intends to offer such testimony. ECF No. 276 at 4. Alternatively, the Court notes that its above ruling would preclude such testimony.

The portion of Morpho's motion challenging Dr. Ruthven's testimony regarding "non-infringing alternatives" as unreliable is **DENIED**. Morpho fails to demonstrate that Dr. Ruthven's level of expertise in dryer technology is insufficient to qualify him to testify about the state of dryer technology as of a given point in time. Morpho has also failed to demonstrate that Dr.

5

A0000072

Ruthven's testimony on such issue is not grounded in fact or is otherwise unreliable such that the entirety of such testimony should be excluded. That said, should more careful line-drawing be necessary regarding certain elements of Dr. Ruthven's testimony either because it: (1) crosses into prohibited testimony on obviousness or invalidity; or (2) lacks an adequate basis in fact, Morpho may raise the appropriate objection at trial. Accordingly, Morpho's motion is **GRANTED**, in part, deemed **MOOT**, in part, and **DENIED**, in part.

### III. Summary

As discussed above, Morpho's motion to exclude Dr. Harrington's testimony regarding non-infringement is **GRANTED** (ECF No. 93), although Dr. Harrington is not precluded from testifying to matters falling within his expertise in ion mobility spectrometry. Morpho's motion to exclude Dr. Ruthven's testimony regarding infringement, invalidity, the substance and disclosure of the prior art, and the existence of non-infringing substitutes, is **GRANTED** in part, deemed **MOOT** in part, and **DENIED** in part (ECF No. 99).

The Clerk is **REQUESTED** to send a copy of this Memorandum Opinion to all counsel of record.

6

A0000073

It is so **ORDERED**.

/s/ Mark S. Davis
Mark S. Davis
United States District Judge

Norfolk, Virginia
November **30**, 2012

7

A0000074

US006815670B2

## (12) United States Patent
### Jenkins et al.

(10) Patent No.: **US 6,815,670 B2**
(45) Date of Patent: ***Nov. 9, 2004**

(54) **MATERIALS AND APPARATUS FOR THE DETECTION OF CONTRABAND**

(75) Inventors: **Anthony Jenkins**, North Reading, MA (US); **William J. McGann**, Raynham, MA (US); **Joseph D. Napoli**, Windham, NH (US); **Kevin J. Perry**, Pelham, NH (US)

(73) Assignee: **General Electric Company**, Schenectady, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/657,223**

(22) Filed: **Sep. 8, 2003**

(65) **Prior Publication Data**

US 2004/0094707 A1 May 20, 2004

### Related U.S. Application Data

(63) Continuation of application No. 09/411,455, filed on Oct. 1, 1999, now Pat. No. 6,642,513.

(60) Provisional application No. 60/103,168, filed on Oct. 6, 1998.

(51) Int. Cl.[7] .......................... G01N 00/00; H01J 49/00

(52) U.S. Cl. ...................... **250/286**; 250/288; 250/287; 250/282; 73/863.12; 73/863.23; 73/864.34

(58) Field of Search ................................. 250/288, 286, 250/282, 287; 73/863.12, 863.23, 864.34

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,596,440 A | 8/1971 | Nutter et al. | |
| 3,968,297 A | 7/1976 | Sauer | |
| 4,045,997 A | 9/1977 | Showalter et al. | |
| 4,317,995 A | * 3/1982 | Bradshaw et al. | .......... 250/288 |
| 4,731,283 A | 3/1988 | Sakane et al. | |
| 4,772,794 A | 9/1988 | Jenkins | |
| 4,781,972 A | 11/1988 | Sakane et al. | |
| 4,788,226 A | 11/1988 | Curry | |
| 4,964,309 A | 10/1990 | Jenkins | |
| 4,997,067 A | 3/1991 | Watts | |
| 5,232,770 A | 8/1993 | Joseph | |
| 5,342,434 A | 8/1994 | Wu | |
| 5,405,781 A | * 4/1995 | Davies et al. | .................. 436/52 |
| 5,491,337 A | * 2/1996 | Jenkins et al. | .............. 250/287 |
| 5,741,984 A | 4/1998 | Danylewych-May et al. | |
| 5,760,314 A | 6/1998 | Bromberg et al. | |
| 5,859,362 A | 1/1999 | Neudorfl et al. | |
| 5,859,375 A | 1/1999 | Danylewych-May et al. | |
| 5,915,268 A | 6/1999 | Linker et al. | |
| 5,922,104 A | 7/1999 | Park et al. | |
| 6,169,045 B1 | 1/2001 | Pike et al. | |
| 6,261,979 B1 | 7/2001 | Tanaka et al. | |
| 6,375,886 B1 | 4/2002 | Angadjivand et al. | |
| 6,642,513 B1 | * 11/2003 | Jenkins et al. | .............. 250/288 |

#### FOREIGN PATENT DOCUMENTS

EP      0 247 243      of 1987

* cited by examiner

*Primary Examiner*—John R. Lee
*Assistant Examiner*—Kalimah Fernandez
(74) *Attorney, Agent, or Firm*—Gerald E. Hespos; Anthony J. Casella

(57)      **ABSTRACT**

A detector requires a stream of dry air for transporting particles to the detector. The detector then operates to determine whether the dry air has transported any particles of interest. Continuous operation of the detector is permitted by providing first and second dryers that can be operated alternately for drying air that is to be directed to the detector. The dryer that is not being operated is recharged. Air is directed alternately between the first and second dryer to ensure that neither dryer is operated after reaching saturation.

**25 Claims, 6 Drawing Sheets**



FIG.1
PRIOR ART



FIG.3

FIG.2

22

22

Case: 13-1559 Case: PARTICIPANTS ONLY Document: 23 Page: 146 Filed: 02/08/2014 Filed: 02/03/2014



FIG.5

FIG.4

Case: 13-1559 CaSASE-PSRTICIDANTSeON23 DoRagen1421 FiRagd2/03/20Eled: 02/03/2014



FIG.6

FIG.7

A0001297

Case: 13-1559 CASE PARTICIPANTS ONLY Document: 23 Page: 148 Filed: 02/03/2014



FIG.8

A0001298



FIG.9

US 6,815,670 B2

1

# MATERIALS AND APPARATUS FOR THE DETECTION OF CONTRABAND

This application is a continuation of U.S. Patent Application Ser. No. 09/411,455 filed Oct. 1, 1999 now U.S. Pat. No. 6,642,513 which claims the benefits of 60/103,168 filed Oct. 6, 1998.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The subject invention is directed to materials that can be used to collect traces of contraband. The subject invention also is directed to an apparatus for detecting trace particles and condensed vapors of contraband.

### 2. Description of the Related Art

Detection systems exist for detecting particulate and condensed phase traces of materials, such as narcotics and explosives. Such systems are marketed by Ion Track Instruments, Inc., which is the assignee of the subject invention. One system of Ion Track Instruments, Inc. is shown in U.S. Pat. No. 5,491,337. Other systems for these general purposes are marketed by Barringer Technologies Inc. under the name Ion Scan Detection Systems and by Intelligent Detection Systems of Canada, under the name Sirius. These prior are systems are deployed, for example, at airports to detect and prevent the introduction of explosives and to detect and deter the traffic in narcotics.

The prior art detection systems rely upon the fact that trace amounts of contraband will be transferred to the body of a person who had handled the contraband and subsequently will be transferred from the body to any article the person may be carrying (e.g., purse, suitcase, backpack, etc.). Trace amounts of contraband may be collected for analysis by wiping a small sheet-like wipe or trap across the purse, suitcase, backpack or other article of the suspect. The prior art wipe or trap then is inserted into a prior art detection apparatus which tests for the presence of certain contraband particles or vapors.

Sample wipes or traps used in such prior art detection apparatus typically have been made of paper, cotton cloth or porous PTFE (Teflon). Each of these prior art sampling media have their own shortcomings. For example, pure Teflon material has a very low coefficient of friction, and therefore does not efficiently remove small particles from rough surfaces. Paper and cotton wipes or traps, on the other hand, may pick up particles more efficiently. However, paper and cotton also pick up water. As a result, they delay the evaporation process of the target materials and inhibit the response. Therefore, prior art paper and cotton wipes or traps are not well suited for use on surfaces that may be wet. Although these prior art sample wipes are fairly efficient for detecting particulates, they are significantly less efficient for detecting vapor. In particular, Teflon is not the best vapor trap, and paper has many active sites which do not release the trapped vapor after the sample wipe has been placed in a detection apparatus.

The prior art detection systems typically rely upon a sample being collected on a sampling medium, such as the above-described sample wipes or traps. These samples may be transferred physically into the prior art detection apparatus as identified above. Alternatively, the sampling medium itself may be heated. The heat is intended to cause at least portions of the sample to be evaporated and then drawn into the detection system on an air stream. This latter prior art method generally is preferred because it allows the detection of condensed vapors which may have been collected, as well as any particulate material.

2

An existing system sold by Ion Track Instruments, Inc. is illustrated schematically in FIG. 1. This prior art system of FIG. 1 is similar to the system described in greater detail in the above-referenced U.S. Pat. No. 5,491,337. The prior art system of FIG. 1 analyzes samples that are collected on sample wipes consisting of a clean porous filtered paper. These wipes are dropped into a thermal desorber 12 in FIG. 1. Desorbed material is carried into the detector by the action of a sampling pump 14. The sample air is drawn into the detector 16 over a dimethyl silicone membrane 18. Some contraband or other materials of interest diffuse through the membrane 18 and into the detector 16, which may be an ion mobility spectrometer or an ion trap mobility spectrometer. The dimethyl silicone membrane 18 eliminates all dust, dirt and most atmospheric materials, including water, all of which may cause problems in the detector 16. Unfortunately, the membrane 18 is only a few percent efficient at transferring the materials of interest, and this efficiency can limit the ultimate sensitivity of the apparatus 10.

In view of the above, it is an object of the subject invention to provide a filter material for sampling vapor and particulates which enables air flow through the material for vacuum sampling.

It is another option of the subject invention to provide an efficient sample pick-up that is suitable for use on rough surfaces and that will perform well on wet surfaces.

It is another object of the subject invention to provide sample pick-up material that is low in cost and/or that is reusable.

A further object of the subject invention is to provide a detection system that retains the advantages of the prior art systems, while improving the efficiently of the transfer of materials of interest into the detector.

## SUMMARY OF THE INVENTION

The subject invention is directed to an improved sampling medium for a detection system and to a detection system with improved performance.

The sampling medium of the subject invention may be an open weave glass fabric which is coated with a thin layer of Teflon. The coating is carried out in such a manner to leave spaces open between the respective fibers of the fiberglass web. Similar materials are used for specialty conveyor belts, and such conveyor belts are marketed by Greenbelt Industries. Small patches of this open weave glass fabric coated with Teflon picks up particulate matter from wet and dry surfaces simply by wiping the small patch of material across the surface. However, the prior art open weave glass fabric coated with Teflon, as used on conveyor belts, is not efficient for picking up samples of material of interest from rough or pitted surfaces. It has been found that the efficiency of pick-up can be improved significantly by roughening the surface with an abrasive to cut through the surface of the Teflon coating at a plurality of spaced-apart locations and to break some of the glass fibers free. This produces a three-dimensional surface, with the broken fibers extending angularly from the plane of the material substantially in the manner of a brush. The fibers act as a scrubbing material and pick-up small particles into the matrix. The Teflon has been found to hold the remaining weave together and to enhance durability of the sample trap.

The sample traps can be manufactured by starting with prior art open weaved glass fabric coated with Teflon and intended for the above-referenced specialty conveyor belts. The fabric then may be subjected to an abrasive action to cut through the surface of the Teflon and to break some of the

US 6,815,670 B2

3

glass fiber free into the above-referenced brush-like configuration. The elongate sheet of material then is subjected to punching or cutting to produce small circular or rectangular traps.

An alternate trap or wipe material is a non-woven felt fabric made of high temperature polyamide fiber. This material is more abrasive than Teflon, and therefore for many applications may not require the abrasive treatment of the above-referenced glass woven fabric that had been coated with Teflon. Additionally, the non-woven felt fabric made of high temperature polyamide fiber exhibits superior high temperature performance. The preferred embodiment is a thin sheet with a thickness of less than 3 mm. Wipes of this type have been found to allow a high flow of air when a small vacuum is applied to one side. The material retains both large and small particles, and also traps vapors from low volatility contraband, such as cocaine vapor or plastic explosives vapors. The non-woven felt fabric made of high temperature polyamide fiber also has a low thermal inertia, which allows the trap to be heated rapidly to temperatures exceeding 200° C., where most contraband of interest evaporates rapidly.

A detection system that may be used with the sample wipes described above employs a desorber to purge the sample wipe of unwanted atmospheric constituents and volatile contaminants. These unwanted atmospheric constituents, such as water vapor and oxides of nitrogen upset the detection process. This purging is achieved in the desorber by feeding dry air from a manifold above and below the sample wipe or trap through a series of small holes along the mouth of the desorber. Alternatively, the dry air may be directed through a narrow slot or through other means for creating an air curtain. The dry air passes through the wipe and purges out the ambient air. The purged air then passes to the outside atmosphere, thus creating a dry air curtain at the entry to the desorber. A portion of the dry air fed through the manifold system presses down the desorber. As the trap or wipe is introduced into the desorber, it quickly obtains the temperature of the desorber. The materials of interest evaporate and are carried on the air stream of dry air into the detector. The detector preferably is an ion mobility spectrometer or an ion trap mobility spectrometer as described above with reference to FIG. 1 and as described in significantly greater detail in U.S. Pat. No. 5,491,337.

In another embodiment, the trap or wipe is operated by an automated actuator. The actuator pushes the trap in and out of the desorber, but does not pull it completely out. In the outer position, a high flow of air is drawn through the trap by the action of a vacuum pump. Any material which is drawn into the trap, is captured, and subsequently introduced into the desorber by actuating the trap into the desorber. The material captured by the trap is evaporated in the desorber as described above, and is passed into the detector.

The above-described trap system can be incorporated into a walk-through configuration. In this latter embodiment, air is allowed to flow over the subject's body either horizontally or vertically. For example, the trap can be disposed in a portal through which the subject may move. Preferably, the trap is disposed at a location in the portal vertically above the subject. The air then is caused to flow through the trap mounted near the test subject by the action of a suction pump. All vapors and particles entrained in the air sample are trapped in the trap and subsequently are detected.

The trap material in this latter embodiment traps samples only from an air stream, and is not used to wipe surfaces. This gives an opportunity for using trap materials which

4

may otherwise be too abrasive. An example of a suitable material is a stainless steel filter material, which provides good trapping efficiency for vapors, as well as good trapping of particles.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic view of a prior art ion trap mobility spectrometer.

FIG. 2 is a side elevational view of a trap in accordance with a first embodiment of the subject invention.

FIG. 3 is a perspective view showing the trap being placed in a detection apparatus.

FIG. 4 is a side elevational view of a second embodiment of a trap.

FIG. 5 is a perspective view of a vacuum sampler employing the trap of FIG. 4.

FIG. 6 is a cross-sectional view of a describer for use in a detection system, such as the detection system of FIG. 1.

FIG. 7 is a side elevation view similar to FIG. 6, but showing the sample trap being inserted into the desorber.

FIG. 8 is a schematic view of the desorber of FIGS. 6 and 7 incorporated into a detection system.

FIG. 9 is a schematic view of a dryer system.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

A sample trap in accordance with a first embodiment of the subject invention is identified generally by the numeral 22 in FIGS. 2 and 3. The sample trap 22 is formed from an open weave glass fabric coated with a thin layer of PTFE (Teflon). The weaving and coating is carried out such that open spaces are defined between the elements of the fiberglass web. The initial product may be a conveyor belt, such as the specialty conveyor belts marketed by Greenbelt Industries. However, the open weave glass fabric coated with Teflon and used for specialty conveyor belts is roughened with an abrasive material to cut through the surface of the Teflon at selected locations on the woven fiberglass fabrics and to break some of the glass fibers free. Thus, as shown schematically in FIG. 2, short sections of glass fibers will be directed away from the plane of the fabric in substantially the manner of a brush. These broken fibers act as a scrubbing material and pick up small particles into the matrix for subsequent analysis in a detection apparatus as explained further herein. The roughened woven glass fabric then is subjected to a punching or cutting operation to produce small sample traps that are appropriately configured and dimensioned for the particular detection apparatus. More specifically, as shown in FIG. 3, the roughened coated glass fabric has been punched into the circular sample trap. In other embodiments, the fabric may be cut into rectangular squares.

An alternate embodiment of the subject sample trap is identified generally by the numeral 24, and is illustrated schematically in FIG. 4. This alternate trap is a non-woven felt fabric made of a high temperature polyamide fiber. The trap 24 has a thickness "t" as shown in FIG. 4 of less than 3 mm, and preferably in the range of approximately 1–2 mm. This material allows a high flow of air when a small vacuum is applied to one side of the trap 24. The material is more abrasive then a Teflon fabric, and therefore retains both large and small particles and also traps vapors from low volatility contraband, such as cocaine vapor and plastic explosives vapors. The non-woven high temperature polyamide fiber of the trap 24 has a superior high temperature performance and

US 6,815,670 B2

5

a low thermal inertia. The low thermal inertia allows the trap 24 to be heated rapidly to temperatures exceeding 200° C., which is a temperature where most contrabands of interest evaporate rapidly. The sample trap 24 may be used in an apparatus substantially in the manner shown in FIG. 3 above. Alternatively, the trap 24 may be cut into a rectangular shape and may be used in a hand-held vacuum sampler 26, as shown in FIG. 5.

The trap 22 or the trap 24 described and illustrated above may be used in the prior art detection system described above and illustrated in FIG. 1, or in other prior art systems. Alternatively, the sample traps 22 and 24 may be used in a more efficient system that includes a heated desorber as shown, for example, in FIGS. 6 and 7 and as identified generally by the numeral 30. The desorber 30 causes the sample trap 22 or 24 to be purged of unwanted atmospheric constituents, such as water vapor or oxides of nitrogen. More particularly, the sample trap 22 or 24 is pushed into the desorber 30 as shown in FIG. 7. Dry air is fed from the manifold 32 above and below the sample trap through a series of small holes 34 along the mouth 36 of the desorber 30. The dry air passes through the trap 22, 24 and purges out the ambient air in the trap. The purged air passes to the outside atmosphere, thus creating a dry air curtain at the entry to the desorber 30. A portion of the dry air flow fed through the manifold system 32 passes down the desorber 30. As the trap 22, 24 is introduced into the desorber 30, it quickly attains the temperature of the desorber 30. Materials picked up on the trap 22, 24 evaporate and are carried on the stream of dry air into the outlet 38 leading to the detector 40 as shown in FIG. 8. The detector 40 which is illustrated schematically in FIG. 8 may be an ion mobility spectrometer of an ion trap mobility spectrometer as shown in FIG. 1 and as described in greater detail in the above-referenced U.S. Pat. No. 5,491,337.

The trap 22, 24 may be moved relative to the desorber 30 by an automatic actuator. The actuator may push the trap 22, 24 in and out of the desorber 30, but does not entirely eject the trap 22, 24. In the out position of the trap 22, 24, a high flow of air is drawn through the trap 22, 24 by the action of a vacuum pump. Any material which is drawn into the trap is captured and subsequently introduced into the desorber 30 by actuating the trap into the desorber. The material captured by the trap 22, 24 is evaporated in the desorber 30, as described above, and is passed into the detector 40. In this embodiment, the trap system can be incorporated into a walk-through configuration. Here, air may flow over the subject's body, either horizontally or vertically. The air then may be caused to flow through the trap mounted near the test subject, by the action of a suction pump. Vapors and particles entrained in the air sample are trapped in the trap 22, 24 and subsequently are detected as described above and in U.S. Pat. No. 5,491,337.

The apparatus described above with reference to FIGS. 5–8, is particularly useful for the traps 22 and 24 of the subject invention. However, prior art traps also may be employed. Additionally, the walk through the detector described above does not require the trap to be wiped across the surface of the article or subject being tested. Hence, the trap may be formed from a material that could be too abrasive for wiping on a surface. For example, a stainless steel filter material may be used with a walk through trap, including a desorber as described above. The stainless steel filter material provides good trapping efficiency for vapors, as well as good trapping of particles.

In a further embodiment, the drying material may be recycled automatically by employing two drying tubes as

6

shown in FIG. 9. In the position shown in FIG. 9, a five way valve directs air from the pump through the dryer bed A and to the detector system. Some of this air is directed in the reverse direction through dryer B. At the same time, dryer B is heated by a small heater to a temperature exceeding 100° C. Water is liberated from the dryer and escapes to atmosphere through the five way valve. After a time sufficient to dry most of the water from dryer B, the heater thereof is switched off, and the temperature of dryer B is allowed to fall back to ambient. After a further interval, but before dryer A becomes saturated, the five way valve is switched, thus reversing the flows. Dryer B becomes the active dryer, while dryer A is heated and reactivated. The entire process is either regulated by a timer or by a measure of the humidity of the air being circulated. This cycle may be measured by the detector system.

What is claimed is:

1. A detector apparatus comprising: a detector for detecting trace amounts of particles of interest carried on a stream of air; two dryers in communication with the stream of air; at least one valve in communication with the dryers for selectively placing a first of the dryers in communication with the detector; and at least one heater for selectively recharging a second of the dryers while the first dryer is in communication with the detector.

2. The apparatus of claim 1, wherein the valve is a five-way valve for directing a first portion of dried air produced by the dryer that is in communication with the detector towards the detector while directing a second portion of the dried air from the dryer that is in communication with the detector toward the other of the dryers for transporting moisture from the other dryer.

3. The apparatus of claim 1, wherein the detector is an ion trap mobility spectrometer.

4. The apparatus of claim 1, further comprising a timer connected to the valve for alternately placing the first and second dryers in communication with the detector after a selected time.

5. The apparatus of claim 1, further comprising a humidity measurer for measuring humidity in the stream of air, the humidity measurer being operative to operate the valve at a selected humidity level.

6. The apparatus of claim 1, wherein the heater is operative for selectively heating the dryers to a temperature greater than 100° C.

7. The apparatus of claim 1, wherein the at least one heater comprises first and second heaters for selectively heating the first and second dryers respectively.

8. The apparatus of claim 1, wherein each of the dryers is operative for removing moisture from the stream of air and wherein each of the heaters is operative for heating the dryers sufficiently for vaporizing moisture collected in the respective dryer so that the vaporized moisture can be purged from the respective dryer.

9. A detector apparatus comprising: a detector for detecting trace amounts of particles of interest carried on a stream of air; two dryers in communication with the stream of air for removing moisture from the stream of air, such that each said dryer produces a stream of substantially dry air; at least one valve in communication with the dryers for selectively placing a first of the dryers in communication with the detector; and two heaters associated respectively with the dryers for heating the dryers sufficiently for vaporizing moisture collected therein and enabling the vaporized moisture to be purged from the respective dryer, whereby the dryer and heaters are operated alternately for enabling a substantially continuous stream of dried air to be in com-

A0001302

US 6,815,670 B2

7

munication with the detector and enabling substantially continuous operation of the detector.

**10.** The apparatus of claim **9**, further comprising a timer connected to the valve for alternately placing the first and second dryers in communication with the detector after a selected time.

**11.** The apparatus of claim **9**, further comprising a humidity measurer for measuring humidity in the stream of air, the humidity measurer being operative to operate the valve at a selected humidity level.

**12.** A detector apparatus having a detector for detecting trace amounts of materials of interest carried into the detector through a detector inlet on a stream of air, the detector apparatus comprising traps formed from a material for collecting said materials of interest, a desorber having an inlet for communicating with one of the traps to be tested for the materials of interest and an outlet communicating with the detector inlet, the desorber including a manifold communicating with the inlet to the desorber for directing air from the manifold and across the inlet to the desorber, a heater for heating the desorber to evaporate any of the materials of interest on the trap, a pump for carrying the materials of interest on the air and into the detector; and a dryer assembly for drying air directed into the desorber, the dryer assembly comprising at least first and second dryers and at least one valve for selectively placing one of the first and second dryers in communication with the desorber while substantially isolating the other of the first and second dryers from the desorber.

**13.** The apparatus of claim **12**, further comprising first and second heaters in proximity to the respective first and second dryers and being selectively operable for recharging the dryers.

**14.** The apparatus of claim **13**, wherein the detector is an ion mobility spectrometer.

**15.** The apparatus of claim **13**, wherein the detector is an ion trap mobility spectrometer.

**16.** The apparatus of claim **13**, wherein the inlet of the desorber has a plurality of small holes for directing dry air from the manifold.

**17.** The apparatus of claim **13**, further comprising a timer connected to the valve for alternately placing the first and second dryers in communication with the detector after a selected time.

**18.** The apparatus of claim **13**, further comprising a humidity measurer for measuring humidity in the stream of air, the humidity measurer being operative to operate the valve at a selected humidity level.

**19.** The apparatus of claim **13**, wherein the inlet to the desorber is a narrow slot.

**20.** A method for continuously operating a detector for detecting particles of interest, said method comprising:

operating one of first and second dryers for defining an operated dryer and a non-operated dryer;

directing a stream of air through the operated dryer for transferring moisture from the stream of air to the operated dryer to produce a stream of dry air;

directing the stream of dry air from the operated dryer toward an object to be tested for particles of interest and then toward the detector;

8

recharging the non-operated dryer; and

switching the stream of air from one of the dryers to the other after the non-operated dryer has been at least partially recharged and before the operated dryer has become saturated.

**21.** The method of claim **20**, wherein the switching step is carried out after passage of a selected period of time.

**22.** The method of claim **20**, wherein the switching step is carried out based on a measurement of moisture in the stream of dry air.

**23.** The method of claim **20**, wherein the re-charging step comprises heating the non-operated dryer to a temperature of at least 100° C.

**24.** A method for continuously operating a detector for detecting whether an object has any particles of interest, said method comprising:

operating a first dryer;

directing a stream of air through the first dryer for transferring water from the stream of air to the first dryer;

recharging a second dryer for purging water from the second dryer while the stream of air is directed through the first dryer;

redirecting the stream of air through the second dryer after the second dryer has been at least partly recharged and before the first dryer has become saturated with water; and

recharging the first dryer while the stream of air is directed through the second dryer.

**25.** A method for continuously operating a detector for detecting particles of interest, said method comprising:

operating a first dryer for producing a first flow of dried air;

directing a first portion of the first flow of dried air towards the detector for delivering potential particles of interest into the detector;

directing a second portion of the first flow of dried air through a second dryer and simultaneously heating the second dryer sufficiently for liberating water from the second dryer;

terminating the first flow of dried air from the first dryer and operating the second dryer for producing a second flow of dried air;

directing a first portion of the second flow of dried air towards the detector for transporting potential particles of interest into the detector;

diverting a second portion of the second flow of dried air from the second dryer to the first dryer and simultaneously heating the first dryer for liberating moisture from the first dryer, whereby the first and second dryers are operated sequentially prior to either of the first and second dryers being saturated for permitting continuous operation of the detector.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by KENYON & KENYON LLP, Attorneys for Defendant-Appellant to print this document. I am an employee of Counsel Press.

On February 3, 2014, Counsel for Appellant has authorized me to electronically file the foregoing BRIEF FOR THE DEFENDANT-APPELLANT SMITHS DETECTION INC. with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel for the parties registered as CM/ECF users, including any of the following:

> Richard L. Brophy
> Jennifer E. Hoekel
> ARMSTRONG TEASDALE LLP
> 7700 Forsyth Blvd., Suite 1800
> St. Louis, MO 63105
> Telephone: (314) 621-5070
> Facsimile:  (314) 621-5065
> rbrophy@armstrongteasdale.com
> jhoekel@armstrongteasdale.com
> *Counsel for Morpho Detection, Inc.*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

February 3, 2014                    /s/ Robyn Cocho
                                    Counsel Press

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 28.1(e)(3), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i), the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

1.      Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), the brief contains 13,596 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  February 3, 2014                         */s/ Zaed M. Billah*
                                                              Zaed M. Billah